[No. 23301.  *En Banc.*  February 8, 1932.]

IDA PETERSON, *as Administratrix, Appellant,* v. GREAT
NORTHERN RAILWAY COMPANY *et al.,*
*Respondents.*[1]

*Vanderveer, Beardslee & Bassett* and *Clarence J.
Coleman,* for appellant.

*Thomas Balmer, Edwin C. Matthias, Charles S.
Albert,* and *J. Speed Smith,* for respondents.

[1]Reported in 7 P. (2d) 963.

MAIN, J.—This action was brought to recover damages for wrongful death. The plaintiff is the administratrix of the estate of William E. Peterson, deceased, and brings this action on behalf of herself as his widow. The cause was tried to the court and a jury, and resulted in a verdict in favor of the plaintiff and against the defendants, Great Northern Railway Company and John Imberg, in the sum of $35,000. The defendants moved for judgment notwithstanding the verdict, and, in the alternative, for a new trial. The motion for judgment notwithstanding the verdict was sustained. The motion for new trial was not passed upon. From the judgment entered dismissing the action, the plaintiff appeals.

The facts essential to be stated, upon which the appellant's case was based, are these: The accident out of which the litigation arose happened at about five o'clock p. m., October 3, 1929, in the town of Monroe, in Snohomish county, where one of the streets of that town crosses the main line track of the Great Northern Railway Company. The railway track extends east and west. The street may be said to extend north and south, though this is not strictly accurate. Approximately 260 feet west of this intersection there was a heavy metal standpipe, used to supply the railway company's engines with water, which was about 9½ feet from the south rail of the main line track.

A railway train, operated by John Imberg as engineer and Lyman Durand as fireman, which consisted of the engine, a baggage car, two coaches and a buffet car, was proceeding west on the main line track. Peterson was proceeding north on a street which crossed the track in a Ford truck or "station wagon," as one witness called it. This truck had a seat in front, and in the back was space for the carrying of

milk and other articles. Peterson was driving, and in the seat on the right-hand side there rode with him a boy, thirteen years of age.

As the truck approached the track, other cars had stopped to permit the train to go by. The driver of one of the other cars sounded his horn two or three times to attract Peterson's attention and thus prevent him from attempting to cross in front of the approaching train, but Peterson drove straight onto the track, and, when he did so, the truck was struck by the engine, lifted onto the pilot and there held in place by what is referred to as the drawhead of the engine which passed through the right hand side of the truck. The truck rested about level on the pilot, with the probability that the left side was a little lower than the right, and the rear end a little lower than the front. No part of the automobile was touching the ground or the railway tracks. After the impact, Peterson and the boy were lying in the back part of the truck, with their heads to the back and their feet to the front.

In this condition the automobile was carried until it reached the standpipe above referred to, with which the rear end collided and caused the left side of the truck to lower. At a point about 130 or 140 feet west of the standpipe, Peterson and the boy rolled out of the truck, Peterson first and the boy following. After they rolled out, the train proceeded something like a hundred feet before it was stopped. After the train was stopped, it was backed up a few feet, and Peterson and the boy were taken out from under the wreckage of the truck. The boy had a broken leg and some cuts and bruises, but beyond this was not seriously injured. He did not, however, remember anything that happened after the railway engine struck the side of the truck. Peterson was badly injured in one leg, one

arm, his head and chest, and died on the way to the hospital.

One witness, who did not see the engine strike the truck, but saw the situation soon after, testified:

"That he heard the crash, looked out of the window, saw the milk truck on the pilot and cans rolling on the ground. That the truck looked just like it had been picked up; it was sitting up on an even keel, almost level sidewise, as far as I could see. When I got to the end of the street, I heard another crash, the rear end of the truck had hit the standpipe. When I got down to where the train had stopped, they had reversed the engine and were backing up, about ten feet, maybe more. The bodies were lying there, between the rails, Mr. Peterson and the boy. The truck was stuck on the pilot, the bumper having swung into the right door and was hooked in. When the rear end of the truck hit the standpipe it kind of tucked it in there. Until the truck hit the standpipe, it was riding up. The train stopped near the light post that had been removed. The distance from the standpipe to where the train stopped was approximately 270 feet. That the truck was riding clear when it was resting on the pilot. . . . That the train came to a stop very gradually, just as if it was going to stop at the station."

Another witness testified that:

"After the bodies had rolled out onto the track, they hung onto the truck, hung along as near as he could judge twenty or thirty feet right on the rail and after they had gone twenty or thirty feet, they began to be tucked under the wreck; when the train stopped just part of the body was under the wreckage. That the train backed once, three or four feet, something like that. That Mr. Peterson's body was inside; that their heads were under the wreckage, but their bodies were not under; that they were unconscious."

The funeral director, who took charge of Peterson's body immediately after it was taken from the wreck, as to the extent of the injuries testified:

"He was very badly bruised and mangled and several deep cuts in his face and under his eyes, one eye was nearly out and one arm was practically cut off; it was hanging by the cords and one leg was absolutely mashed. When he removed his clothing he had to be very careful not to pull his leg off with his clothing. There was a big hole in the back, way through to the gray matter in the skull and the gray matter ran out on the operating table; his chest was crushed so badly through there that he could not feel any bones in there at all; it was all just a mass."

The engineer, at the time of the collision, was riding on the right-hand side of the engine, and the brakeman on the left. When the brakeman observed that Peterson was driving the truck in front of the train, he called to the engineer, Imberg, in a loud voice: "That will do;" which means an emergency stop. The station at Monroe was a short distance to the west of where the train came to a stop.

The witnesses for the appellant testified that the train was moving at from twenty to twenty-five miles an hour at the time of the collision. The expert witnesses called by the appellant testified that a train such as the one involved, moving at that speed, could be stopped in two hundred feet or less. The evidence offered by the respondents was in conflict in material particulars with that offered by the appellant, but we are not here concerned with this disputed testimony, since the cause was tried to the jury.

The first question is whether the evidence was such as to sustain a finding of the jury that Peterson's death was caused by injuries which he received after he rolled out of the truck, and not at the time of the collision. We are conscious that this court has many times held (1) that a verdict of the jury must be sustained by substantial evidence, and that a mere scintilla of evidence is not sufficient; (2) that the verdict

cannot rest on speculation and conjecture; (3) that a mere possibility that an accident happened in a particular way is not sufficient; (4) that the mere fact that one is uninjured in a collision does not establish the fact that others might not or did not receive injuries in the same collision; and (5) that, where the evidence is equally consistent with an hypothesis that the defendant was not negligent, and also one that he was, the proof tends to establish neither. It is not our intention to depart from any of the propositions stated.

There is another rule which is equally as well settled as those mentioned, which is controlling in this case, and that is, that the evidence is sufficient if it affords room for men of reasonable minds to conclude that there is a greater probability that the accident causing the injury happened in such a way as to fix liability upon the person charged with such liability, than it happened in a way for which the person so charged would not be liable. *St. Germain v. Potlatch Lumber Co.*, 76 Wash. 102, 135 Pac. 804; *Lee v. Gleason Company*, 146 Wash. 66, 262 Pac. 133.

The question then is, as applied to the facts in the case now before us, whether, from the evidence offered, the jury had a right to find that Peterson sustained the injuries from which he died after he rolled out of the truck rather than that they were sustained at the time of the collision. The jury could well find that the injuries to Peterson's arm, leg, chest and head were sustained after he rolled out of the truck. There is no evidence that he sustained any injury at the time of the impact, with the exception of the testimony of one witness, which will be shortly noticed.

The boy, who was sitting on the side next to the engine, as already stated, when taken from under the wreck, had a broken leg and some cuts and bruises,

but there is no evidence as to when these were received. After the collision, two or three witnesses examined the inside of the truck and testified that there was no blood therein. As stated, Peterson and the boy, after the collision, were lying in the back end of the truck.

One witness, who was sitting in an automobile with her husband nearby where the collision occurred and saw it, testified that, after the collision and before the standpipe was reached, Peterson's head was hanging out of the truck not very far "from the rail;" that he had a "terrified expression" upon his face, and that his face was red; that his eyes seemed to pop out of his head, and that his head was about a foot from the ground. She did not testify as to seeing any blood. This witness testified that, after the collision, she was "extremely excited," and her husband testified that "she became hysterical" and he took her home.

The jury had a right to weigh the testimony of this witness along with all the other evidence in the case. It would be going too far for the court to say, as a matter of law, that this testimony overcame the inference which the jury had a right to draw from the other evidence offered. It is a well-known rule that a case will not be taken from the jury when there is substantial evidence to sustain the verdict, or where there is reasonable inference from the facts established by the evidence which will sustain the verdict.

We think that, in the case now before us, the jury had a right to find that there was a greater probability that Peterson met his death from injuries which he sustained after he rolled out of the truck than there was that he sustained injuries at the instant of impact which would have produced his death. Had Peterson sustained the injuries to his arm, leg, head and chest at the time of the collision, or some of them, there

undoubtedly would have been blood stains on the inside of the truck. The question was one for the jury.

The next question is whether the engineer of the train, after being notified by the fireman to make an emergency stop, exercised reasonable care in making the stop as soon as it was reasonably possible. Peterson, of course, when he drove his truck in front of the approaching train, was guilty of negligence of the most positive character. After the truck was picked up on the pilot of the engine and held there, Peterson had reached a position of peril from which he could not extricate himself, and here is presented a situation for the application of the doctrine of the last clear chance, one of the rules of which is that:

"Where the defendant did not actually see the peril of the plaintiff, but by keeping a reasonably careful lookout commensurate with the dangerous character of the agency and the locality should have seen the peril and appreciated it in time, by the exercise of reasonable care, to have avoided the injury, and failure to escape the injury results from failure to keep that lookout and exercise that care, the defendant was liable only when the plaintiff's negligence had terminated or culminated in a situation of peril from which the plaintiff could not, by the exercise of reasonable care, extricate himself."

*Mosso v. Stanton Co.,* 75 Wash. 220, 134 Pac. 941. L. R. A. 1916A 943; *Leftridge v. Seattle,* 130 Wash. 541, 228 Pac. 302.

Imberg, the engineer, when called as a witness on behalf of the respondents, testified:

"I just got over the crossing when the fireman hollered 'That will do.' When he hollered real loud, as in a case like this, I knew there was something wrong and it meant stop right away. I thought at first something was broke about the engine on his side, or somebody had run against the engine, or that somebody had run in front of us, I didn't know there was an

automobile on the front until twenty feet before we stopped.''

As already stated, the expert evidence offered by the appellant was to the effect that the train could have been stopped in a distance of two hundred feet or less. If this had been done, it would have stopped before it reached the standpipe, and before Peterson sustained the injuries from which the jury had a right to find that he died. The evidence offered by the respondents was that the train was proceeding at a materially faster speed than twenty to twenty-five miles per hour, and their expert witnesses testified that it could not be safely stopped before it reached the standpipe, which, as stated, was approximately 260 feet away.

The respondents criticize the expert testimony of the appellant as to the distance in which the train could be stopped, on the ground that the witnesses did not take into consideration, in making a stop, the safety of the persons and property on the train. When the testimony of the expert witnesses of the appellant is read, it is only fair to infer therefrom, or at least the jury had a right to so infer, that they were not testifying as to a stop of such suddenness as would result in either damage to persons or property on the train. It would be an invasion of the province of the jury to hold, as a matter of law, in this case that there was not evidence which would sustain the verdict on this question.

It is said, however, that the last clear chance doctrine does not apply where one is required to act instantaneously. But that rule has no application here. After the engineer received the warning to make an emergency stop, an appreciable length of time would elapse before the stop could be made. In *Norton v. Seattle,* 113 Wash. 408, 194 Pac. 373, it was held that

whether a gripman had the last clear chance to avoid killing a child was for the jury, where there was evidence that the child was carried some distance on the fender of the car, after being struck, before the car was stopped. It was there said:

"If, by the exercise of reasonable care after the gripman knew, as he must have, that the child had been caught in the fender of the car, the car might have been stopped before the fender passed over the child, the jury might be justified in finding that he did not make use of his last clear chance of averting the catastrophe. The weight of this evidence, of course, was for the jury."

In the present case, the question of whether the engineer exercised reasonable care to stop the train after he had been called to by the fireman to make an emergency stop, was for the jury.

The judgment will be reversed and the cause remanded, with directions to the superior court to pass upon the motion for new trial.

BEALS, PARKER, MITCHELL, MILLARD, BEELER, and HERMAN, JJ., concur.

TOLMAN, C. J. (dissenting)—The impact of the original collision was of such a character and of such force and violence as to provide ground for a reasonable inference that every injury described in the majority opinion at all likely to prove fatal was inflicted at the time of the original impact.

This collision being caused by the admitted negligence of Peterson, the burden was upon the appellant to show that the injuries thus received did not cause death, but that the fatal injuries were received later because of the negligent acts of the respondents. In this, she failed utterly, as I read the record, and at most presented only evidence that the fatal injuries might have been inflicted by the later acts.

548

Two causes for the fatality were thus presented to the jury—each equally probable—one for which respondents would be liable, and the other for which they would not be liable. With no fact and no reasonable inference from fact to guide their choice, the average jury would, through natural sympathy, choose the first; and the jury did so in this case. That choice, in my opinion, was speculation, pure and simple, and the trial court was right in granting judgment n. o. v.

I therefore dissent.

HOLCOMB, J., concurs with TOLMAN, C. J.