[No. 24731.   Department Two.   May 15, 1934.]

WINFIELD A. GREEN, *Appellant*, v. AXEL LANGNES *et al.*, *Respondents.*[1]

*Vanderveer & Bassett* and *Winter S. Martin,* for appellant.

*Wright, Jones & Bronson,* for respondents.

[1]Reported in 32 P. (2d) 565.

GERAGHTY, J.—This action was brought by the plaintiff against defendants to recover damages for personal injuries, under the provisions of § 33 of the Merchant Marine Act of 1920 (46 U. S. C. A., § 688). The cause was tried to the court and a jury, and resulted in a verdict in favor of plaintiff in the sum of five thousand dollars. The defendants moved for judgment notwithstanding the verdict, or, in the alternative, a new trial. The court granted the motion for judgment notwithstanding the verdict, and denied the motion for a new trial. Judgment was entered dismissing the action. Plaintiff appeals.

This case, involving the claim of a fisherman against the master of a halibut fishing vessel, is before us for determination after a stormy voyage of nearly seven years, in the course of which it has been before the United States district court twice, the circuit court of appeals once, and the United States supreme court twice. *The Aloha,* 32 Fed. (2d) 284; *Green v. Langnes,* 35 Fed. (2d) 447; *Langnes v. Green,* 282 U. S. 531, 51 S. Ct. 243; *The Aloha,* 56 Fed. (2d) 647; *Ex Parte Green,* 286 U. S. 437, 52 S. Ct. 602. We are called upon to refer to these cases in the Federal courts no further than to say that they resulted in a final determination that the appellant was entitled to prosecute his suit at common law in the state courts.

The respondents are husband and wife, and the owners of a motor driven halibut vessel, The Aloha, employed in the halibut fishing industry. The husband, Axel Langnes, was master of the vessel, and will be referred to hereafter for convenience as if sole respondent.

The facts, in so far as they are essential to the consideration of the issues raised upon this appeal, may be summarized as follows: In the spring of 1927, respondent employed appellant and three other

fishermen to fish for halibut on the banks northwest of the state of Washington. The men were to be paid by a share of the proceeds of the catch. Two-fifths was to go for the ship; the expenses were to be paid first out of the other three-fifths, and the remainder divided between the members of the crew, including the respondent as master.

In fishing for halibut, a heavy ground line was used, varying in length from eighteen hundred to several thousand feet. To this ground line, at intervals of about thirteen feet, leaders, called gangions, fifty-two inches in length, were attached, each gangion having a heavy halibut hook. The line was drawn in by a power winch. As it was drawn aboard, it passed over a large metal roller set upon the starboard rail. The position of this roller on the rail was within a few inches of a metal strap, or chain plate, to which was secured the starboard backstay. The metal strap was bolted in a vertical position to the side of the vessel, and stood out somewhat less than a quarter of an inch from the wood surface.

The appellant performed the duties of engineer, as well as tending the ground line as it was drawn in. It was his duty to pull in the gangions as they came over the roller, and to remove with a gaff hook any fish on the halibut hooks. The winch was controlled by a lever near the place where the line tender was stationed, and he could by its use start or stop the movement of the line. When the winch was in operation, it drew in the ground line at the rate of about two feet per second.

On May 13, 1927, after appellant had been employed some weeks, while tending the ground line as it was drawn in, one of the halibut hooks caught upon something on the side of the vessel, was snapped loose by

the pull of the winch, flew back and struck appellant in the left eye, causing its loss. He alleged in his complaint that the hook caught upon the chain plate in proximity to the roller; that it was negligence on the part of respondent to leave the chain plate uncovered, and to place the roller over which the line passed so close to the chain plate. The respondent denied negligence, and pleaded assumed risk and contributory negligence on the part of appellant.

The appellant testified in part as follows:

"Q. Did you have any trouble in hauling in the line, from time to time on this 'Aloha'? A. No extra trouble, except catching, the hooks catching. After we fixed the sheave so it would hold the ground line —the first trip it was slipping so that when it would hook up it would be so solid it would slip on the sheave. Q. When did you first begin to have trouble with the hooks catching? A. Right after we fixed the sheave so that it would grip the ground line enough to tear these hooks loose. Q. When was that, with reference to the accident? A. That was on the second trip. Q. That was the first time that you had any trouble with the hooks? A. Well, the first time that there was any danger, or that I noticed them that they were slipping. At times I used to have a slack-up and holding on the gear until they cleared. Q. What did the hooks catch on? A. They caught on the backstay iron. Q. What is the backstay iron, and where is it located on the side of the vessel, with reference to the roller that is on the railing? A. Well, in this case the roller was setting right up against the backstay iron. I do not know whether it was touching it or not, but if it was not it was so close that you could hardly tell. . . .

"Q. What, if anything, did you say to the defendant Langnes about that condition of affairs? A. Well, before I went to the roller—I was tending the roller or tending the line as we were coming in, and as I came up in the morning I pointed with my left hand—I pointed across to this chain plate and in the

direction of it, and I told him that I was afraid of that thing there, except that I put it a lot stronger than that, because I never was afraid of anything since I have been fishing as I was of that. Q. Why was it that you told him that? Why did you mention it? What was the occasion? A. Because the hooks had been flying the previous day. Q. Been catching on it, you mean? A. Yes, been catching, and whenever the hooks caught up there they flew back with tremendous force. . . . Q. What did the Captain say when you complained about the hooks catching on this chain plate? A. Well, he just said it was safe enough and wanted me to go ahead and use both hands clearing the gangion and that it was 'all right.' That was the phrase he used. The hooks caught right after that. I was injured about two o'clock in the afternoon on the third day of fishing.''

Cross-examination:

"Q. Now, you have told us, Mr. Green, that this particular hook that we are referring to now caught on the forward side of the after chain plate? A. Yes, sir. Q. Why do you say that? A. I say that by the direction that it took when it came into my eye—by the lead that it followed. Q. You mean that judging from the thing in the air as you saw it you know that it caught on the chain plate? A. Yes, sir. Q. You didn't see it actually catch on the chain plate, did you? A. I felt it catch on the chain plate as well as saw it. . . . Q. You didn't see it actually catch on the chain plate, did you? A. No. Q. So when you say that it caught on the chain plate you are simply guessing to that extent, is that correct? A. Well, I can say that I know without seeing. Q. You were, as a matter of fact, back a short distance from that rail at the time, weren't you? A. I was. . . . Q. Well, how far? Two feet? A. Yes, sir, maybe. I cannot say exactly because that is a long time ago. . . . I was two or three feet from the rail. I could not see down over the outside of the vessel at all. I could not see any of the chain plate below the rail. . . .

"Q. Now, your reason for stating that this hook caught on this chain plate that you have referred to is simply by reason of the fact that the hook seemed to be caught down in that general neighborhood some place, isn't that right? A. No. Q. Now, tell us again why you say it caught on the chain plate. A. Because of the lead on the gangion. Q. What do you mean 'by the lead'? A. Shall I explain that? Q. What do you mean 'by the lead' if you don't mean merely direction? A. Well, possibly yes, direction. You can call it direction. Q. Then it is a fact, so far as you know, that this hook caught in the direction—in the general direction of where you would figure a chain plate to be, looking from the back side of the vessel's rail? A. Yes, sir. Q. And that is as accurately as you can say that this hook caught on any particular part of this vessel's hull? A. Yes."

The respondent testified that, at the time when the accident occurred, he was in the pilot house maneuvering the vessel; that, as the ground line passed up over the roller, he looked out of the window and

". . . saw two hooks come up together, hook and hook, in such position. (Illustrating.) Then the man at the roller continued hauling them, and before they got to the roller the hook, or the leader that goes down from the hook, that holds up, broke or tore away and let go and the remainder of it snapped into the water. I did not see what happened to the upper hook at that time. This was the first I observed, and then I saw the man hold his hand to his eye. I am referring to Mr. Green."

In answer to appellant's testimony that, on the morning of the day of the accident, he had complained to respondent about the hooks catching, respondent testified that he had no recollection of the conversation.

The Aloha was a comparatively new vessel, and numerous witnesses for respondent testified that it was equipped in substantially the same manner as

other ships engaged in halibut fishing. In respect to the chain plates and position of the roller, it appears that the roller was not always in the same position, and that, in some cases, the chain plates were covered.

█ The motion for judgment notwithstanding the verdict was granted upon the ground

". . . that the plaintiff did not submit any evidence from which the jury could properly conclude that the negligence alleged was the proximate cause of plaintiff's injury."

We are unable to agree with the court's view of the probative force of appellant's evidence. It is true he did not testify positively that he saw the hook that injured him catch on the chain plate, and it is also true that the evidence discloses that the hooks might have caught on other places on the side of the ship, but this absence of direct testimony as to where the hook caught is not decisive against appellant.

"We are conscious that this court has many times held (1) that a verdict of the jury must be sustained by substantial evidence, and that a mere scintilla of evidence is not sufficient; (2) that the verdict cannot rest on speculation and conjecture; (3) that a mere possibility that an accident happened in a particular way is not sufficient; (4) that the mere fact that one is uninjured in a collision does not establish the fact that others might not or did not receive injuries in the same collision; and (5) that, where the evidence is equally consistent with an hypothesis that the defendant was not negligent, and also one that he was, the proof tends to establish neither. It is not our intention to depart from any of the propositions stated.

"There is another rule which is equally as well settled as those mentioned, which is controlling in this case, and that is, that the evidence is sufficient if it affords room for men of reasonable minds to conclude that there is a greater probability that the accident causing the injury happened in such a way as to fix liability upon the person charged with such liability,

than it happened in a way for which the person so charged would not be liable. *St. Germain v. Potlatch Lumber Co.,* 76 Wash. 102, 135 Pac. 804; *Lee v. Gleason Company,* 146 Wash. 66, 262 Pac. 133." *Peterson v. Great Northern Ry. Co.,* 166 Wash. 538, 7 P. (2d) 963.

"The mere fact that the accident might have happened from a cause not attributable to appellant's negligence does not render the verdict speculative or conjectural. The respondent was not called upon to prove that the accident did *not* result from every other possible cause than appellant's negligence. He was only required to prove the negligence alleged and present evidence which showed that, in all reasonable probability, his injuries were the proximate result of that negligence." *Kantonen v. Braley Motor Co.,* 176 Wash. 577, 30 P. (2d) 245.

Applying the rule announced in the foregoing cases, we think that reasonable minds could well reach the conclusion that it was more probable the hook causing appellant's injury caught upon the iron chain plate, rather than upon the wooden portions of the vessel. This probability might be reasonably inferred from the force with which the hook rebounded. The jury could well have reached the conclusion that if the hook had caught on the wooden side of the ship, the resistance not being as great, the resulting rebound would have less force. We think, too, appellant's testimony as to the direction from which the hook came might well have been considered by the jury as of some probative force, as well as his testimony that he felt the hook catch on the chain plate. The appellant testified that he examined the chain plate some time after the accident, and found traces of where the hooks had been catching.

It is a well recognized rule that, in passing upon a motion for judgment notwithstanding the verdict, the court possesses no element of discretion, and that

the motion should be granted only where there is no substantial evidence or reasonable inference to sustain the verdict, and that the evidence will be viewed in the light most favorable to the plaintiff.

The trial court, in granting the motion for judgment notwithstanding the verdict, was largely influenced by the able opinion of Justice Sutherland in *Pennsylvania R. Co. v. Chamberlain,* 288 U. S. 333, 53 S. Ct. 391.

The *Chamberlain* case was brought to recover for the death of a brakeman, alleged to have been caused by the negligence of the railroad company. It was alleged that the deceased, at the time of the accident resulting in his death, was assisting in the yard work of breaking up and making up trains and in the classifying and assorting of cars; that, while riding a cut of cars, other cars ridden by fellow employees were negligently caused to be brought into violent contact with those upon which the deceased was riding, with the result that he was thrown therefrom to the railroad track and run over. The trial court granted a directed verdict in favor of the defendant. The circuit court of appeals reversed the trial court, and the case came to the supreme court upon a writ of certiorari. In its opinion, the supreme court sets out the facts as found in the prevailing opinion of the circuit court of appeals, as follows:

"The plaintiff's only witness to the event, one Bainbridge, then employed by the road, stood close to the yardmaster's office, near the 'hump.' He professed to have paid little attention to what went on, but he did see the deceased riding at the rear of his cars, whose speed when they passed him he took to be about eight or ten miles. Shortly thereafter a second string passed which was shunted into another track and this was followed by the nine, which, according to the plaintiff's theory, collided with the deceased's. After the nine cars had passed at a somewhat greater speed

than the deceased's, Bainbridge paid no more attention to either string for a while, but looked again when the deceased, who was still standing in his place, had passed the switch and onto the assorting track where he was bound. At that time his speed had been checked to about three miles, but the speed of the following nine cars had increased. They were just passing the switch, about four or five cars behind the deceased. Bainbridge looked away again and soon heard what he described as a 'loud crash,' not however an unusual event in a switching yard. Apparently this did not cause him at once to turn, but he did so shortly thereafter, and saw the two strings together, still moving, and the deceased no longer in sight. Later still his attention was attracted by shouts and he went to the spot and saw the deceased between the rails. Until he left to go to the accident, he had stood fifty feet to the north of the track where the accident happened, and about nine hundred feet from where the body was found.''

Commenting upon the foregoing, the court then says:

''That Bainbridge concluded from what he himself observed that the crash was due to a collision between the two strings of cars in question is sufficiently indicated by his statements. But this, of course, proves nothing, since it is not allowable for a witness to resolve the doubt as to which of two equally justifiable inferences shall be adopted by drawing a conclusion, which, if accepted, will result in a purely gratuitous award in favor of the party who has failed to sustain the burden of proof cast upon him by the law.

''And the desired inference is precluded for the further reason that respondent's right of recovery depends upon the existence of a particular fact which must be inferred from proven facts, and this is not permissible in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses consistent with the facts actually proved, from which testimony it affirmatively appears that the fact sought

to be inferred did not exist. This conclusion results from a consideration of many decisions, of which the following are examples: [Citing cases.]''

This somewhat extensive quotation from the *Chamberlain* case illustrates, we think, the essential difference between the facts developed in that case and in the case at bar. In the *Chamberlain* case, the only evidence tending to establish the cause of the accident was that of the single witness, Bainbridge, suspicious and doubtful, as the court characterized it. The question was how the deceased fell from the cars upon which he was stationed. Bainbridge testified that he heard a loud noise, as of cars bumping, in a busy yard, where much switching was carried on; that, sometime thereafter, he saw, at a distance of nine hundred feet, the two strings of cars together. He testified that he stood at a distance of about fifty feet from the track, a position from which the court concluded it would be impossible for him to see the cars come together. Later, the mangled body of the deceased was found on the track. Several other eye witnesses testified there was no collision. Here we have an inference super-imposed upon another inference. The sole witness for the plaintiff did not see the decedent's fall, or the collision of the cars to which he testified, but heard a noise from which he inferred there had been a collision, and from this inference it was sought to be further inferred that the collision caused the deceased to fall to his death.

In the case before us, we have direct evidence to a combination of circumstances from which the jury could reasonably have inferred the cause of appellant's injury. We have proven facts from which it could reasonably be inferred how the injury happened. We cannot escape the conclusion that this was a case for the jury.

▇ As we have seen, the court denied respondent's alternative motion for a new trial. In the trial court, as here, respondent urged the motion upon the ground that improper instructions were given, and certain instructions to which he was entitled refused.

The instructions given and refused are not in the record before us. While it was not necessary for respondent, under our Rule of Practice XII (Rem. Rev. Stat., § 308-12), to take a cross-appeal, certainly we cannot intelligently pass upon the alleged errors without having the instructions before us. While the statement of facts sets out respondent's exceptions in detail, yet quoted excerpts cannot enable us to weigh the propriety of the instructions as a whole. A specific instruction might be refused, and yet the issue fully covered by other portions of the charge as a whole. So, too, some expression in a given instruction when standing alone might be subject to criticism, while when read as part of the whole it might not be obnoxious. On this question we are constrained to follow the trial court. *Elliott v. Wheelock,* 176 Wash. 597, 30 P. (2d) 370.

The order denying a new trial is sustained, the judgment reversed, and the case remanded, with direction to enter judgment upon the verdict of the jury.

BEALS, C. J., BLAKE, TOLMAN, and HOLCOMB, JJ., concur.