[No. 25537. Department Two. October 11, 1935.]

EMMETT SHEA, *Respondent,* v. THE YELLOW CAB COMPANY OF SPOKANE *et al., Appellants.*[1]

[1]Reported in 49 P. (2d) 925.

*Edge & Wilson* and *Wakefield & Witherspoon*, for appellants.

*Padden & Moriarty* and *Joseph J. Lavin*, for respondent.

MITCHELL, J.—This is a personal injury action. Plaintiff, Emmett Shea, was struck and injured by a cab belonging to The Yellow Cab Company of Spokane. The issues were negligence and contributory negligence. The trial resulted in a verdict for the plaintiff. Defendants have appealed.

The accident occurred on Trent avenue in Spokane, at a point within the block between Washington street on the east and Stevens street on the west, about 7:25 a. m., September 2, 1933. The avenue is fifty-five feet wide and runs east and west, upon which is operated a double streetcar track. Washington and Stevens streets run under a railroad viaduct next to and near the station buildings of the Milwaukee and Great Northern railroads. The viaduct parallels Trent avenue on the north.

Respondent, his wife and their child were going east by railroad. Learning that their train stopped in Spokane twenty to twenty-five minutes, they went south from the station across Trent avenue to the O. K. Coffee House for breakfast. The coffee house was situated on the south side of the avenue ninety-three feet east from Stevens street and about two hundred thirty-four feet west from Washington street. Upon leaving the coffee house to return to the railroad station, the respondent, going north across Trent avenue, was struck and suffered the injuries for which the suit was brought.

By the terms of an ordinance of the city and under the evidence, it appears that the location of the accident is a congested district. The ordinance further

provides that vehicles have the right-of-way over pedestrians between intersections and that pedestrians crossing a street within a congested district shall cross only at intersections and pass over only such portion of a street as is included within the lines of a sidewalk projected, and not diagonally.

In important particulars, there was a conflict in the evidence. Respondent testified that, on reaching Trent avenue on the way to the coffee house, there was no traffic on the avenue. His course in crossing was:

"Q. When you crossed over to this restaurant, you crossed about straight across, did you, or at an angle? A. I came straight across."

Upon finishing breakfast, his wife and child preceded him, as he paused to pay for the meals. He walked out to the sidewalk, at which time, according to his testimony, no automobile was parked on that side of the avenue towards Stevens street. He saw the cab about the center of the block to the west of Stevens street, coming east towards the coffee house. Upon reaching the curb, he looked again and saw the cab coming along the south side of the avenue about two hundred twenty-five to two hundred fifty feet west; then, after he stepped out into the street, he testified that he again saw the cab coming from the west when it turned towards the center of the street as if intending to go under the viaduct on the north. He was eight or ten feet behind his wife and child as he crossed the avenue. Upon being asked as to his course in crossing the avenue this time, he answered: "Right across the street the way we came. Q. Straight across, was it? A. Yes."

He again saw the cab twenty or twenty-five feet away, and it struck him as he reached a point a little north of the center of the avenue just as he heard

the brakes of the cab. He estimated the speed of the cab at thirty to thirty-five miles an hour. Mrs. Shea corroborated her husband in most particulars, though not looking so as to see the actual collision. She estimated the speed of the cab greater than that given by her husband.

On the contrary, the driver of the cab testified that there were a number of automobiles parked on each side of the coffee house on the south side of the avenue; that he proceeded east along the line of parked cars on the south side of the avenue at the lawful rate of speed between intersections of twenty to twenty-five miles an hour. He said:

"Q. Now, I will ask you whether or not along by the O. K. restaurant at that time if there were any automobiles parked on the south side of Trent avenue? A. Yes, there were cars parked all along there. Q. Now, then, in that block? A. Yes, sir. Q. Have you any idea, approximately how many? You probably couldn't say definitely? A. No, I haven't. I think there were three cars, anyway, parked west of the O. K. Witness indicating on the map where the three cars were parked. They were parked parallel to the curb. Right where the accident happened there were two cars close together. There was about three or four feet clearance between the cars and my cab, as I went east, my left wheel four or five feet south of the south car track. Q. Then just tell the jury in your own way, as you came along there what happened between you and Mr. Shea. A. I was driving along there as I usually drive, looking straight ahead, and all of a sudden it just seemed like a flash, something came out in front of me and I applied the brakes and turned slightly to the right. I hardly didn't know who it was that I hit, or what kind of a person it was that I hit, whether it was a man or a lady, until I got out of the cab and went to the back end where Mr. Shea lay, . . ."

He testified that, at that time, there was considerable traffic on the streets in and around the scene of the accident. In these particulars, the driver was corroborated by a number of disinterested witnesses, one of whom said that he had parked his car to the west of the entrance to the coffee house; that there was a parked car between his and the entrance to the coffee house; and that he was at the coffee house when respondent and his family left. After testifying that the first thing that attracted his attention was the difficulty respondent's wife and child had crossing the avenue on account of west-bound traffic, he said:

"There was a space between the car ahead of me and the next car. I saw Mr. Shea step off the curb, walk into the street about eight feet, and then I saw him stop and look both ways, about eight feet from where he started. (Witness marks place, 'Shea stopped') After he stopped he started to hasten across the street. I watched him until he got to the car tracks. He was hit on about the first rail."

Of course, the jury determines the facts, and, while all of the testimony has not been referred to, enough has been given to understand the assignments of error.

■ One assignment is that the court erred in denying a motion for a nonsuit at the close of plaintiff's case, and another that the court erred in denying a motion for judgment notwithstanding the verdict. Without any particular discussion, we think, upon all the evidence, there was no error in either of these rulings.

■ The next assignments, Nos. 3 and 4, deal with alleged error in refusing to give requested instructions relative to plaintiff's negligence, as a matter of law, as claimed, in crossing the street at the time of the

accident. The argument is that, as there was no dispute of the fact that respondent violated the ordinance requiring streets in congested districts to be crossed by pedestrians only at intersections, the court should have proceeded upon that theory and not have left it to the jury to say whether the defendants had shown by a fair preponderance of the evidence that the plaintiff had crossed between intersections, as was said in an instruction given instead of the one requested. There is much in the contention, but, since it was so palpably plain that there was no evidence other than that he crossed near the center of the block, we doubt if the jury were misled to the prejudice of the appellant, at least not enough, standing alone, to cause a reversal.

The next assignment is that the court erred in an instruction to the effect that it was the duty of the driver of the cab to sound a warning of his approach. This instruction was given evidently upon respondent's theory that he thought he noticed the cab turning north toward the center of Trent avenue as if to cross it entirely. Since respondent contends that appellant's driver saw respondent crossing the street, the driver would know that respondent, in crossing the street at right angles, would in all reason see him at the same time. Respondent did see him four times. Why would the driver reasonably conclude any warning was necessary unless and until at a time entirely too late to successfully give the warning? There was no occasion for the giving of the instruction.

Two other instructions, Nos. 9 and 10, complained of, deal with the doctrine of the last clear chance. No. 9 defines the first condition under which the rule applies, namely, where the defendant *actually sees* the perilous position of the plaintiff. The

language of the instruction may be accepted as correct and proper to be given, had the required condition existed. But that is the trouble here. The driver testified that he did not see the respondent until just a flash before the collision, and there is no testimony in the record that the driver *actually saw* the plaintiff.

Instruction No. 10 was intended to cover the other phase of the doctrine of the last clear chance. That instruction was as follows:

"I instruct you further that if the plaintiff, in crossing Trent Avenue, had negligently placed himself in a situation of peril and that the driver of the defendant's taxicab did not actually see the peril of the plaintiff but by keeping a reasonably careful lookout commensurate with the dangerous character of the agency he was operating, and the locality, should have seen the peril of the plaintiff and appreciated it in time, by the exercise of reasonable care, to avoid injuring him, and the failure of the plaintiff to escape injury, resulted from the failure of the defendant's driver to keep that lookout or exercise such care, then the defendants would be liable only when the plaintiff's negligence had terminated or culminated in a situation of peril from which the plaintiff could not by the exercise of reasonable care extricate himself. More briefly stated, this instruction means that if both plaintiff and the driver of the taxicab were negligent, neither being aware of the presence of the other in the street until practically at the instant of the happening of the collision, then the defendants would not be liable to the plaintiff, but if before the collision occurred plaintiff's negligence ceased and he saw the taxicab and made an effort to escape the collision but could not escape, then the defendants would be liable, provided the driver in the exercise of reasonable care and diligence should and could have avoided the collision."

The facts in this case do not warrant the giving of this instruction. The plaintiff, by his repeated testi-

mony and all the other proof, was negligent up to the moment he was hurt in crossing the street near the center of the block, contrary to the positive terms of the city ordinance, and there was no proof that the driver of the cab, acting as a careful person, should have seen and appreciated the peril *in time,* by the exercise of reasonable care, to have avoided the injury. The driver, as a prudent person, knew he had the right of way and assumed, of course, that the respondent had knowledge of the same fact. In such a situation, what shall the driver do? Stop midway between intersections until a pedestrian, out of place, clears the street, or should he go ahead relying on the other doing something to protect himself—stop or step out of the way—until entirely too late for the driver, by the exercise of reasonable care, to avoid the accident?

The terms and limitations of the doctrine of the last clear chance were well set out upon a review of our former cases and divided into two separate and distinct parts in the case of *Leftridge v. Seattle,* 130 Wash. 541, 228 Pac. 302, as follows:

". . . (1) that where the defendant *actually* saw the peril of a traveler on the highway and should have appreciated the danger and failed to exercise reasonable care to avoid injury, such failure made the defendant liable, although the plaintiff's negligence may have continued up to the instant of the injury; but (2) that where the defendant did not actually see the peril of the plaintiff, but by keeping a reasonably careful lookout commensurate with the dangerous character of the agency and the locality *should have seen* the peril and *appreciated it in time,* by the exercise of reasonable care, to have avoided the injury, and failure to escape the injury results from failure to keep that lookout and exercise that care, the defendant was liable only when the plaintiff's negligence had terminated or culminated in a

situation of peril from which the plaintiff could not, by the exercise of reasonable care, extricate himself.

"Thus we have two different situations to which the last clear chance rule applies. In the one, the plaintiff's negligence may continue up to the time of the injury if the defendant *actually sees* the peril; in the second, *the plaintiff's negligence must have terminated* if the defendant did not actually see the peril, but by the exercise of reasonable care *should have seen* it."

The *Leftridge* case has been cited with approval in our subsequent cases, including the *En Banc* decision in *Peterson v. Great Northern R. Co.,* 166 Wash. 538, 7 P. (2d) 963. The rule is, and should be considered, well established, but should not be misused, for the reason clearly stated in *Zettler v. Seattle,* 153 Wash. 179, 279 Pac. 570, as follows:

"The last clear chance doctrine is a very just and salutary rule to be applied in a proper case, but its misapplication is fraught with great danger and often leads to unjust results, because it always invites a jury to disregard or excuse contributory negligence which would otherwise bar the action."

All the conduct of the parties here, of which there is any substantial evidence, is embraced within the *issues of negligence and contributory negligence,* upon which the jury was fully and fairly instructed. It was not a case for the application of the doctrine of the last clear chance, and instructions upon that subject constituted prejudicial error.

There are other minor assignments of error which, upon consideration, we think are impliedly disposed of by the foregoing discussion, or they are not substantial or prejudicial.

Because of the errors mentioned, the judgment is reversed and the cause remanded, with direction to grant a new trial.

BLAKE, STEINERT, and HOLCOMB, JJ., concur.