[No. 28359.   Department One.   July 30, 1941.]

J. HOWARD ALLEN, *Respondent*, v. WASHINGTON NATIONAL INSURANCE COMPANY, *Appellant.*[1]

[1]Reported in 115 P. (2d) 685.

564

*DuPuis & Ferguson,* for appellant.

*Jones & Bronson* and *Wheeler Grey,* for respondent.

STEINERT, J.—Plaintiff brought suit upon an insurance policy to recover the amount of indemnity provided for the death of his wife, the person insured. The action was tried to a jury, and a verdict was returned in favor of plaintiff. Defendant insurance company appealed.

On October 14, 1938, appellant, Washington National Insurance Company, in consideration of a premium of one dollar and fifty cents, issued its personal accident insurance policy, with limited liability, to Benna M. Allen, the named insured. Respondent, J. Howard Allen, was designated therein as beneficiary. The policy provided indemnity for loss of life, limb, or sight of the insured through various specifically named accidental means, and fixed the sum of one thousand dollars as the amount of indemnity payable for loss of life resulting from an automobile accident.

The provisions of the policy pertinent to this controversy are as follows:

"Part 4—Automobile, Pedestrian, Passenger Elevator, Burning Building and Other Accidents—$1,000.00

"If Such Injury shall be sustained:

"(a) By the wrecking of any automobile of the exclusively private passenger type, lawfully registered and licensed as such, . . . in which the Insured is riding as driver or passenger, . . . the Company will pay the indemnity provided in Column 4 of Section One . . . [$1,000.00]."

"Part 8—Definitions, Exceptions and General Provisions . . .

"'Wrecking' as used in this policy means injury which necessitates repair in order to place in as good condition subsequent to as before the accident.

"'Riding In' as used in this policy does not extend to nor cover the Insured while on the steps, platform or running board."

On August 14, 1939, while the policy was in force, Mrs. Allen came to her death by reason of an accident which occurred on the private driveway of the Allen premises, and in which an automobile belonging to the Allens was involved. The accident was of an unusual kind, and the exact cause and manner of its occurrence are not definitely known. No one witnessed the tragedy in its entirety, and no one observed Mrs. Allen during the course of the particular event until, at its conclusion, she was found lying mortally injured by the side of the automobile.

Appellant's main contention on appeal is that the evidence was insufficient to warrant submitting to the jury the issue as to whether or not Mrs. Allen's death resulted from causes, and in a manner, covered by the policy, that is, whether or not her death resulted from injuries sustained by the "wrecking" of an automobile in which she was "riding as driver or passenger."

Respondent and his wife, the insured, resided at 917 Twelfth avenue north in the city of Seattle. Their

residence was located on the west side of the street, facing eastward. There were three rooms, in sequence, on the south side of the house, and in the middle, or living, room there was a large bay window. The center sill of the window was eight feet above the ground, and the sill to the right, or west, was slightly higher.

South of the house was a driveway, about eight feet wide, leading from the street westerly to a garage located at the southwest corner of the lot on which the Allen home stood. From a point about on a line with the front of the house, the driveway sloped downward to the garage, dropping fifty-one inches in sixty-nine feet, a gradient of something over six per cent. The driveway was separated from the house by a strip of lawn about seven feet wide, over which the bay window projected approximately two feet. A hedge bounded the driveway on the south.

The garage was a frame structure approximately eleven feet wide from north to south and opening eastwardly, toward the street in front of the house. The east, or front, end of the garage consisted of a set of eight-foot double doors flanked on either side by a narrow section of wall about a foot and a half wide, to which the doors were hinged.

At the time of her death, Mrs. Allen was fifty-nine years of age, was about five feet tall, and weighed one hundred forty pounds. Mr. Allen was seventy-four years of age. They owned a Chevrolet sedan, in which the emergency brake and the gear shift were located alongside the steering wheel, near the middle of the car. Mr. Allen never drove the car, all of the driving being done by Mrs. Allen.

There were but three witnesses whose testimony threw any direct light upon the activity or upon the possible occupancy of the automobile at the time, and during the course, of the accident: Mr. Allen, Mrs.

Russell Hladik, who was a maid in the Allen home, and Mr. Gerald Frink, a friend of the Allen family.

Mr. Allen's testimony was as follows: In the afternoon of the day of the accident, he and Mrs. Allen had driven home in their sedan, arriving there at about four o'clock. Mrs. Allen parked the car on the driveway just beyond the point where the downgrade began, as was her usual custom, so that she could run the car into the garage later without having to start the motor. It was Mrs. Allen's habit, when parking the car in that position, to put on the emergency brake. Mr. Allen could not recall whether or not, on that particular occasion, she had put on the brake and also put the car in reverse gear; he was sure, however, that the emergency brake was on. In this connection, he volunteered the statement that "the brake was the weakest part of the car," and that he "had to have another notch put on the brake to get the car to respond to the brake." In answer to a hypothetical question on cross-examination, Mr. Allen stated that, if an automobile were parked beyond the crest of the driveway, without being put in reverse gear, and the brake were to slip, the vehicle would roll toward the garage.

After alighting from the automobile, Mr. and Mrs. Allen went into the house, where, according to a suggestion contained in Mr. Allen's testimony, two ladies visited Mrs. Allen for an hour or two during the latter part of the afternoon.

After their evening meal, or at about seven o'clock, Mrs. Allen went out to water the lawn. At that time, the car was still at the place where it had been parked three hours before. Mr. Allen remained in the house and, after seating himself in a reclining position near the bay window in the living room, began reading a paper. From his position, he could not see anyone on the lawn, owing to the height of the window above the ground.

A little while later, however, at about seven-thirty o'clock, Mr. Allen heard a scream from outside and, on arising from his chair and looking through the right, or west, portion of the bay window, saw the automobile proceeding down the driveway at a speed of four or five miles per hour. He did not see Mrs. Allen anywhere, although he had a view of the driveway, the interior of the garage, and the right-hand side of the automobile. Parenthetically, it may be observed that, from his position, Mr. Allen was looking down upon the top and right side of the automobile, and therefore was unable to see whether or not anyone was occupying the space within the left side of the car where the driver normally sits; he could, however, have seen anyone of Mrs. Allen's height standing upright on the left-hand running board.

In the position from which he was looking, Mr. Allen watched the automobile as it gathered momentum, until, "with a terrible crash," it struck the narrow front wall at the southeast corner of the garage and, after pausing momentarily, continued rapidly on into the building. He stated that, if it had not been for the collision against the corner, the car would have gone through the far end of the garage because of the delicate framework of that structure.

Mr. Allen then turned and ran hurriedly out through the front door of the house and around to the garage. He there found that the automobile had knocked the narrow wall at the southeast corner inward about two feet, and had torn loose the bracing above so that it hung down over the left rear fender. The car had come to a stop with its left front fender against the south wall of the garage and with its rear end projecting at an angle about two feet into the driveway. The position of the automobile, the frame wall on the south, and the debris at the front formed a triangular pocket

within the garage on the left side of the car, and barred entrance to the garage on that side.

Mrs. Allen at times had been subject to heart attacks, from which, however, she would recover in a very few minutes. Thinking that she had suffered an attack of that nature, and expecting to find her in the driver's seat, Mr. Allen entered the garage at the right-hand side of the car, opened the right front door, and looked inside. Mrs. Allen was not to be seen. He observed, however, that the left front door of the automobile was open three or four inches, and, according to his recollection, the window of that door was closed. Later, on cross-examination, however, he stated that, although he was not positive, he would say that the window was "down."

As he opened the right front door of the automobile and looked inside, he heard Mrs. Allen cry out to him: "Howard, get me out of here." The record is not entirely clear as to whether or not the right rear door of the automobile was open at that time, but Mr. Allen testified that, on looking "through" that door, he saw his wife lying on the floor of the garage, in the triangular space described above. Her head and arms were leaning partly against the south wall of the garage, opposite the left rear fender of the car, and her feet were extended in the direction of the left front fender.

At about the same time, Mrs. Hladik, the maid, entered the garage from the right-hand side and, after climbing over the left front fender of the car, lifted Mrs. Allen into a standing position and, with the assistance of Mr. Allen, placed her in the tonneau of the automobile, where Mr. Allen had in the meantime seated himself. Mrs. Allen asked for a drink of water and also requested that a doctor be called, but she made no statement as to how the accident had occurred. She died within ten minutes, while her husband was still holding her.

Mr. Allen further testified that the faucet, to which the garden hose had been attached during the sprinkling process, had been shut off and that Mrs. Allen had finished sprinkling the lawn before the occurrence of the accident.

Mrs. Hladik testified that, while in the kitchen doing the dishes, she heard a scream from outside and, on looking out of the window, saw the automobile just as it settled back from the crash against the left-hand corner of the garage. From her position, she could not see the left side of the interior of the car. Mrs. Hladik corroborated Mr. Allen concerning a number of the details with reference to the crash, the subsequent position of the automobile, the damaged condition of the garage, the call for help by Mrs. Allen and her position on the floor of the garage, and the manner in which she, the witness, had gained access to Mrs. Allen and had helped to place her in the tonneau of the automobile. She also testified that the left front door of the car was open at the time that she entered the garage.

Mr. Gerald Frink testified that, in response to a telephone call shortly after the accident, he had gone to the Allen home between seven-thirty and eight o'clock in the evening, at which time Mrs. Allen had been removed from the automobile. He corroborated the preceding witnesses with reference to the position of the car and the damaged condition of the garage at the point where the crash occurred. He further testified that on that occasion he got into the car from the right-hand side, intending to move the vehicle entirely into the garage, and that he then observed that the left front door of the car was slightly open, that the gear was in neutral, and that the brake was off.

The automobile was not seriously damaged by the collision. The bumper showed no marks; the fenders

were not bent; and the steering wheel was later found to be in good order. The only sign of injury to the car, beyond several scratches, scrapes, and dents on its left side and top, was the fact that the hinges on the left front door were sprung to such an extent that, without the application of force, the door lacked six inches of closing. The hinges were later repaired by a mechanic, who made no charge for that particular service.

The autopsy, which was performed on the body of Mrs. Allen on the day following her death, revealed that the costal cartilages fastening the breast bone to the ribs were completely torn from the third to the eighth ribs on both sides; both lungs were punctured; the liver was damaged; there was a large amount of blood in both the chest and the peritoneal cavities; abrasions appeared on the left thigh, also along the middle and lower portions of the left leg, and on the front part of the left forearm; there were also abrasions in the left frontal region, right temple, and right cheek. Death was pronounced due to crushed chest and internal injuries. The physician who performed the autopsy testified that the injury was of the type sustained by a person when crushed between two automobiles or when falling from a great height.

Upon the evidence as thus narrated, appellant contends that the verdict of the jury was not founded upon established facts, but was based solely upon conjecture and speculation as to the cause and manner of Mrs. Allen's death. The burden was, of course, upon respondent to prove that the injuries causing her death resulted from the wrecking of an automobile of the exclusively private passenger type, in which she was riding as a driver or passenger. The type of the automobile is not here in issue.

We shall defer until later our consideration of the term "wrecking," as used in the policy, and will devote

our attention, for the present, to the question as to whether or not the jury was warranted in finding from the evidence, as it must have found, that at the time of receiving her injuries Mrs. Allen was "riding in" the automobile, either as driver or as passenger.

It is true that no one saw Mrs. Allen at, or immediately prior to, the time when she sustained her injuries, and that no one could testify positively as to what caused the accident, or how it came about. There is no dispute, however, as to the fact that Mrs. Allen was injured and shortly thereafter died, or as to the fact that her injuries and death were caused by violent means in which the automobile was a contributing agency.

The initial and primary question which the jury had to decide, in order to establish liability on the part of appellant, was whether Mrs. Allen was "riding in" the automobile at any time from the moment it started down the driveway until it crashed into the corner of the garage. It will be assumed that if, during that period of time, she was on the driveway, and was struck or knocked down by the automobile, there would be no liability under the terms of the policy. On the other hand, if she was in the automobile, either as driver or as passenger, at the time of, or immediately before, the crash, and her injuries were caused by the "wrecking" of the automobile, the cause of the wreck would be immaterial. Another point to be considered in this connection concerns the meaning of the words "in which" and "riding in," referring to the automobile, as those terms are used in the policy.

Respondent was not required to prove the cause of the accident by direct evidence alone. He could resort, as he was compelled to do in this instance, to circumstantial evidence; that is, to proof of facts which, though not in themselves conclusively estab-

lishing the fact in issue, would nevertheless tend to establish it by affording a satisfactory inference of its existence, according to the reasoning and common experience of mankind. Furthermore, as to the amount or degree of proof necessary, respondent was not required to prove beyond a reasonable doubt, but only by a preponderance of the evidence, the material facts essential to a recovery. The evidence would be sufficient if it afforded a basis for reasonable minds to conclude that there was a greater probability that the accident was caused in such a manner as would create liability on the part of the person from whom recovery was sought, than that it was caused in a manner from which no such liability would flow.

The principles just stated find their most frequent expression in negligence cases, but they are equally applicable to cases, such as this, where liability is predicated upon the contract of a compensated insurer. The leading case in this jurisdiction announcing those rules and principles is *St. Germain v. Potlatch Lumber Co.*, 76 Wash. 102, 109, 135 Pac. 804, 806, wherein this court said:

"While it is a sound rule that to sustain a finding that the appellant's negligence was the proximate cause of the injury, the evidence must present something more than a mere possibility or conjecture, it is equally sound that the cause of an accident may be inferred from circumstances. A plaintiff in this character of case is not obligated to establish the material facts essential to a recovery beyond a reasonable doubt. Such a rule would amount to a denial of justice. It is sufficient if his evidence affords room for men of reasonable minds to conclude that there is a greater probability that the accident causing the injury happened in such a way as to fix liability upon the person charged with such liability, than it is that it happened in a way for which the person so charged would not be liable. 'There are very few things in human affairs, and

especially in litigation involving damages, that can be established to such absolute certainty as to exclude the possibility, or even some probability, that another cause or reason may have been the true cause or reason for the damage, rather than the one alleged by the plaintiff. But such possibility, or even probability, is not to be allowed to defeat the right of recovery, where the plaintiff has presented to the jury sufficient facts and circumstances surrounding the occurrence as to justify a reasonable juror in concluding that the thing charged was the prime and moving cause.' In other words, the plaintiff is only required to satisfy the jury, by a fair preponderance of the evidence, that the accident causing the death occurred in the manner he contends it did."

The following cases, presenting a variety of circumstances, are equally expressive of the same rules and principles: *Mathis v. Granger Brick & Tile Co.,* 85 Wash. 634, 149 Pac. 3; *Sweeten v. Pacific Power & Light Co.,* 88 Wash. 679, 153 Pac. 1054; *Frescoln v. Puget Sound Traction, L. & P. Co.,* 90 Wash. 59, 155 Pac. 395; *Armack v. Great Northern R. Co.,* 126 Wash. 533, 219 Pac. 52; *Tubb v. Seattle,* 136 Wash. 332, 239 Pac. 1009; *Lee v. Gleason Co.,* 146 Wash. 66, 262 Pac. 133; *Peterson v. Great Northern R. Co.,* 166 Wash. 538, 7 P. (2d) 963; *Kantonen v. Braley Motor Co.,* 176 Wash. 577, 30 P. (2d) 245; *Green v. Langnes,* 177 Wash. 536, 32 P. (2d) 565; *Cockerline v. Anderson,* 184 Wash. 701, 52 P. (2d) 321; *Hessler v. Moore,* 188 Wash. 80, 61 P. (2d) 1001; *Lang v. Puget Sound Nav. Co.,* 189 Wash. 353, 65 P. (2d) 1069; *Thomas v. Inland Motor Freight,* 190 Wash. 428, 68 P. (2d) 603; *McGrady v. Brink,* 195 Wash. 626, 81 P. (2d) 800; *Nelson v. Columbia Clinic, Inc.,* 1 Wn. (2d) 558, 96 P. (2d) 575; *Atkins v. Clein,* 3 Wn. (2d) 168, 100 P. (2d) 1, 104 P. (2d) 489; *Nelson v. West Coast Dairy Co.,* 5 Wn. (2d) 284, 105 P. (2d) 76; *McLaren v. Department of Labor & Industries,* 6 Wn. (2d) 164, 107 P. (2d) 230.

■ Viewing the evidence in the light of these principles, we are of the opinion that the jury was clearly warranted in finding from the evidence, as its verdict indicated that it did find, that there was a greater probability that the accident causing the injuries and death occurred while Mrs. Allen was riding as a driver of, or passenger in, the automobile, than that it occurred while she was elsewhere than in the vehicle.

It is true that no one can now say with absolute certainty that Mrs. Allen got into the automobile while it was yet stationary; that she intentionally or unintentionally released the brake, thereby permitting the car to start forward down the driveway; and that for some reason, whether because she had become frightened, or otherwise, she then sought to escape from the automobile just before it crashed into the garage. Nevertheless, it seems to us, after a careful consideration of all the known facts and circumstances, not only that such is a reasonable explanation of the accident, but also that the greater probability is that it happened in just that way. In coming to that conclusion, we have considered the entire event, from its two extremes in point of time.

Viewing the incident from the standpoint of its initiation, we note the following circumstances: The car had been parked for three hours at a point where it was necessary to have the brake on in order to keep the vehicle from moving forward. It was customary to park the car in that manner, so that it could later be driven into the garage by simply releasing the emergency brake and manipulating the steering wheel and foot brake without turning on the motor. Mrs. Allen was the only one in the family who drove the car. The evening meal had been concluded, Mrs. Allen had finished her work of sprinkling the lawn, darkness was approaching, and the time and occasion had arrived

when the car was to be stored in the garage for the night. Mrs. Allen was expected, and intended, to perform that duty. So far as the record shows, no one other than Mrs. Allen was ever near the car, or even on the lawn, on that occasion. During all that time, the car had not moved, or been moved. Suddenly Mrs. Allen screamed, which indicated that something serious had happened. Mr. Allen saw the automobile run down the driveway, covering a distance of sixty-nine feet, and crash into the garage. Mrs. Hladik heard the scream and saw the car an instant later. The driveway and the interior of the garage were in plain view of those looking out of the windows of the house, but Mrs. Allen was not to be seen either on the driveway or in the garage. She must therefore have been in the driver's seat, or on the left-hand running board, or underneath the left front fender and bumper of the car. Had she been standing on the running board, her head could have been seen above the top of the automobile. Had she been crouching on the running board, she would most likely have been scraped off when the car struck the garage, and would then have lain outside of the garage, rather than inside that building, where she was in fact found. Had she been underneath the left front bumper and fender, she either would have been run over on the driveway or else would have been shoved into the garage in front of the car; but her position after the accident was in the triangular space in the garage on the left side of the automobile, and opposite the rear door. The fact that she was not seen in the driver's seat is satisfactorily accounted for by the fact that neither Mr. Allen nor Mrs. Hladik while still in the house could see that portion of the interior of the car.

From these circumstances, we think that the jury was fully justified in finding that Mrs. Allen was inside

the car when it started forward from its position of rest. If she were not, it would be most difficult, if not impossible, to explain how she sustained her injuries. Appellant offers no explanation except to suggest, first, that, while on the driveway, she was in some manner knocked down by the automobile after it had slipped its brake and run forward. While there is some evidence that the brake may have been weak, there is countervailing evidence to the effect that its weakness had been repaired by putting another notch in it. At any rate, the brake was strong enough to hold the car on a decline for three hours. To say that it just happened to slip at that particular time is a mere conjecture.

Appellant suggests, also, that vibrations from traffic on the street may have caused the brake to slip. There was no evidence of any moving traffic or of any vibrations, and we consider that explanation to be purely speculative. In this connection, it may be further stated that, if Mrs. Allen was in the automobile intending to drive it forward, it would make no difference whether she voluntarily released the brake, or whether it slipped of its own accord. She would have been the driver of the car in either case.

Viewing the event from the other extreme point of time, we have these facts and circumstances: The front end of the car was within the garage, with its left front fender against the south wall of the building; the front corner wall had been knocked inward, and the upper bracing was hanging down over the left rear fender; the left front door of the automobile was found open; Mrs. Allen was lying on the floor of the garage in the triangular space on the left-hand side of the automobile, with her feet extending toward the front of the car; she had received a violent crushing blow upon the chest and in the area of the abdomen;

there were abrasions upon her body, from her head to the lower part of her limbs. The side of the car showed scratches, scrapes, and dents, and the hinges of the left front door were sprung. The steering wheel, however, was not damaged. The logical inference from these facts is, in our opinion, that Mrs. Allen was inside the automobile, and, in an attempt to escape from it, was caught between the open door and the framework of the car just as the automobile crashed through the front of the garage. It seems to us that no other explanation would satisfactorily account for the kind and range of injuries sustained by her, or for her position when found after the accident.

Whether or not the foregoing analysis has led to the correct and only solution of the cause and manner of the accident, we are at any rate convinced that the jury had the right to say, under the evidence, that the accident occurred in that manner, or at least that the jury was justified in finding that Mrs. Allen was in the car immediately before the crash, and was injured in an attempt to escape.

Appellant's next contention is that the court erred in giving an instruction reading, in part, as follows:

"  . . .  you are instructed that if you believe from a preponderance of the evidence that the said Benna Allen, immediately preceding receipt of said injuries, was riding in said automobile as a driver or passenger, and that she received said injuries while endeavoring to escape from said automobile in the face of an impending danger in which said automobile was 'wrecked', then I instruct you that the plaintiff would be entitled to recover herein."

and in refusing to give a certain instruction proposed by appellant.

It will be observed that the theory of the instruction given by the court is in accord with our analysis and conclusion stated above. Appellant does not con-

tend that the words "riding in," as contained in the policy, limit the coverage to such injuries only as are sustained by a person while actually inside an automobile, as distinguished from those received while attempting to escape therefrom in the face of imminent peril. Appellant's contention is simply that there was no evidence to warrant the giving of such instruction.

Without repeating what we have already said upon that subject, we will dispose of appellant's contention simply by saying that in our opinion the evidence, direct and circumstantial, was sufficient to warrant the court in giving the instruction of which complaint is made.

The instruction which was proposed by appellant purported to advise the jury that if Mrs. Allen died as a result of "falling out of or being thrown from said automobile" there would be no coverage under the policy. The coverage provisions contained no such limitations. If Mrs. Allen was riding in the car at the time of its "wrecking," as that term is defined in the policy, it would make no difference whether she was injured while still in the car or whether, as a result of such wrecking, she fell or was thrown from the car. The proposed instruction was rightly refused.

Appellant's final contention is that there can be no recovery in this case, because, allegedly, the evidence fails to show any "wrecking" or disablement of the automobile. The argument seems to be that in order to constitute a wrecking or disablement, the automobile must have been rendered incapable of further operation without repairs. The difficulty with that argument is that appellant's own policy specifically defines the term "wrecking" as meaning:

" . . . injury which necessitates repair in order to place in as good condition subsequent to as before the accident."

While the damage to the automobile was not serious and did not require a great deal of attention, the fact is that, in order to place it "in as good condition subsequent to as before the accident," the car would, and did, require repair, whether actually made or not. The scratches and dents on the fenders and top would undoubtedly mar its appearance to some extent and would accordingly depreciate its selling value. Aside from that, however, the hinges were sprung and prevented a proper closing of the door. To remedy that defect, the hinges had to be straightened. While the car was not "wrecked" in the usual sense of that term, there was a "wrecking" within the construction placed upon that word by the policy itself. The cases cited by appellant upon that subject are inapposite, because in those cases there was no such definition as the one contained in the policy here involved.

The judgment is affirmed.

ROBINSON, C. J., MAIN, BLAKE, and DRIVER, JJ., concur.