[No. 12492. Department Two. May 29, 1915.]

JESSE MATHIS, *Appellant*, v. GRANGER BRICK & TILE COMPANY, *Respondent*.[1]

EXPLOSIVES—INJURIES—NEGLIGENCE—QUESTION FOR JURY. In an action by a minor child for injuries sustained from the explosion of a dynamite cap, there was sufficient evidence of defendant's negligence to go to the jury, where it appears that a partly filled box of dynamite caps was found by boys in the soil pit of defendant's brick yard, where they were used by defendant's employees and were, from time to time, left for indefinite periods, and no one in particular of the employees was held responsible by the defendant for their care and custody; it being a reasonable and natural inference that the caps were where found as a result of the work in which they were used at that place, and through the agency of the men charged with the blasting.

SAME — NEGLIGENCE — INTERVENING CAUSE — QUESTION FOR JURY. Where there is evidence sufficient for the jury as to defendant's negligence in not safeguarding dynamite caps, which came into the possession of young boys, a question as to whether such negligence was the proximate cause of the injury to another child, or whether an independent, intervening, efficient factor relieved defendant from liability, is a question for the jury, where it appears that two boys of fourteen and thirteen years of age, who found the dynamite caps, carried them around in their pockets not knowing that they could be exploded in any other way than by a fuse, until by experience they learned otherwise, and it was doubtful whether they appreciated their dangerous character; that, in running and playing on the school grounds, a cap fell from the pocket of one of the boys, and was seen and picked up by plaintiff, a child of eleven years, who, not knowing what it was, carried it several days in the pocket of his overalls without showing it to any one; that in washing the overalls, his mother removed all the trinkets from the pockets, including the

[1]Reported in 149 Pac. 3.

cap, which plaintiff took up and began picking the substance out with a hairpin, when it exploded, causing the injuries complained of.

SAME. In such a case, the act of the mother in noticing the dynamite cap in taking the things from her son's pockets was not an independent, intervening, efficient cause of plaintiff's injuries, where she testified she had never seen a dynamite cap, and laid it on one side, with the other things, "not dreaming of its being a dynamite cap."

Appeal from a judgment of the superior court for Yakima county, Kauffman, J., entered June 25, 1914, upon granting a nonsuit, dismissing an action for personal injuries sustained by a minor through the explosion of a dynamite cap. Reversed.

*David Rankin, N. K. Buck, James O. Cull,* and *George B. Holden,* for appellant.

*McAulay & Meigs,* for respondent.

ELLIS, J.—This is an action for personal injuries. For some years prior to the spring of 1913, the defendant owned and operated a brickyard near the town of Granger, a village of about five hundred inhabitants in Yakima county. The yard was located between the Yakima river and a range of hills, known as Snipes Mountain. The material for making bricks came from two sources; clay from the clay pit, on the side of the mountain several hundred feet from the brickyard, and soil from the soil pit, immediately adjacent to the yard and machinery. The soil pit was an excavation to a depth of about thirty feet below the level of the yard. Near the yard, were houses for employees, and the town of Granger and the nearest school building were about a half mile distant. The public highway leads south from the town of Granger, passing immediately in front of this plant and near the soil pit. To secure material from the two pits, it was necessary to loosen the earth by blasting. This was usually done with giant powder, fuse and fulminating caps, called in the record dynamite caps. The supply of explosives was usually stored

five or six hundred yards from the plant, in the hillside, in an enclosure made by placing a wooden door in front of an excavation that had formerly been used as a part of the clay pit, to which we have already referred. The door was never locked, but had a danger sign upon it. In the vicinity of the brick yard, petrified wood had been found, and children and others were accustomed to frequent the locality in search of it. Small children were freqently in and about the plant and the soil pit, which was not enclosed with fences or other barriers. There was no evidence that the respondent ever objected to their presence. There was no danger sign anywhere about the plant except on the door of the machinery building.

On about the first day of April, 1913, Eric Hilton and Ray Martin, two boys, who were then attending the public school, went over to the brickyard after school, one of them said looking for lizards in the soil pit. They found in one of the buckets of the elevator, used for hoisting soil from the pit, near the bottom, a partly filled box of dynamite caps. These they took and hid, and on the next day carried some of them to school. There was evidence tending to show that, while these two boys and the plaintiff, Jesse Mathis, then a boy about eleven years old, were running and playing together on the school ground, one of the caps fell from the pocket of either Ray Martin or Eric Hilton, probably the latter, and was picked up by the plaintiff, who said he saw it before it struck the ground. He carried this cap for a few days in a pocket of his overalls, showing it to no one. He did not know what it was. On Saturday the plaintiff's mother washed these overalls and removed the cap, with a large number of other trinkets, from the pockets, placing them on a desk in the sitting room. The plaintiff finding it there, picked it up and undertook to pick the substance out of it with a hair pin, when it exploded, mutilating the thumb and three fingers of his left hand and injuring his left ear, resulting in the loss of the fingers and thumb and a perma-

nent impairment of his hearing. Other evidence, so far as necessary, will be discussed in considering the questions presented. At the close of the plaintiff's evidence, the court granted a nonsuit and dismissed the action. The plaintiff appeals.

If the judgment of dismissal can be soundly sustained, it must be upon one or all of three grounds, which may be stated in logical order as follows: (1) That the evidence was insufficient to establish actionable negligence on the respondent's part. (2) That the boy Eric Hilton was an independent, intelligent, intervening, efficient factor interrupting the chain of causation and relieving the respondent from liability in any event, in that its negligence was not the proximate cause of the injury. (3) That the appellant's mother was likewise an intervening cause. We shall consider these in their order.

I. The respondent contends that there was no evidence as to how the box of caps came to be in the bucket in the soil pit. Many familiar decisions are cited to the effect that verdicts based upon pure conjecture will not be permitted to stand. In applying this principle the respondent loses sight of the clear distinction between pure conjecture and reasonable inference. Negligence, like any other fact, may be proven by circumstantial evidence.

The evidence here shows that respondent had been using explosives in the soil pit and in the clay pit for a number of years. There was no evidence that any one else had used such explosives in that vicinity except on one occasion in 1911, when dynamite was employed in an effort to raise the body of a person who had been drowned in the Yakima river. Dynamite for that purpose was then secured from the respondent because it could not be procured elsewhere in the vicinity. In the consideration of the motion for a nonsuit, we must assume that the boys Eric Hilton and Ray Martin found the dynamite caps in the respondent's soil pit, the place where they say they found them. The respondent

claims that the tin box containing the caps was never taken into the soil pit, but only so many caps as were necessary to fire the blasts contemplated at a given time. The evidence shows that this was the usual course, but that it was not universal is inferable from the testimony of two witnesses who had been in respondent's employ for several years. One of these testified that he often did the blasting and handled the explosives; that he generally took sufficient caps from the clay pit to the soil pit to do the blasting, but sometimes had caps left, which were "supposed" to be returned to the clay pit. He recalled one time in particular when the box of explosives was left at the soil pit on top of the bank; that he found it there and left it there and went back to burning brick, and did not know how long it remained. The other testified that the explosives were kept "a good part of the time" in the clay pit on the hill, and sometimes down in the soil pit under certain waste timbers that were piled there; that the box containing both caps and dynamite was put under "rubbage and old boards" to keep dry; that while a passerby could not see it from above, it could be seen readily from down in the pit; that it was on a bank something like half way from the top of the pit, but could be reached easily by climbing a little way up. When asked how long he had known the caps to remain there, he answered, "Oh, I couldn't tell you. I couldn't answer that question exactly at all. Just the limits of time I don't know." The evidence was clear and ample that the explosives were habitually kept in a most careless manner in the clay pit, guarded by nothing more substantial than a wooden door which was never locked.

In view of all these circumstances, we think that when it was shown by positive evidence that these boys found the caps on the premises and in the soil pit, where they were habitually used by the respondent's employees and where they were, from time to time, left for indefinite periods, the evidence indicating that no one in particular was held responsible by the respondent for their care and custody, it was

for the jury to say whether or not the caps were left by some of the employees of the respondent where they were found by the boys. In such a case the negligence of the employees is imputed to the master. There can hardly be reasonable doubt that the caps found belonged to the respondent. There can be no doubt that if they did, they would not have been found there had the respondent kept its explosives under lock or securely safeguarded, which was its positive nondelegable duty. There was ample evidence to take the case to the jury on the question of the respondent's negligence.

In *Crabb v. Wilkins*, 59 Wash. 302, 109 Pac. 807, a case presenting facts quite similar to this phase of the facts here, the trial court granted a nonsuit on the ground that no negligence was proved. Reversing the judgment, this court said:

"But we think that the court erred in this respect, and that there was sufficient testimony to go to the jury on that proposition, and that while there was no direct testimony concerning the manner in which these caps found their way to the place where the boys obtained them, it was a reasonable and natural inference, which the jury would be warranted in drawing from the facts proven, that they came there as a result of the work which was going on in that place and in which they were used, and through the agency of the men who were operating the drill."

See, also, *City of Victor v. Smilanich*, 54 Colo. 479, 131 Pac. 392.

II. At the time of the accident, Eric Hilton was nearly fourteen years old. Ray Martin was about a year younger. Eric knew the caps were dynamite caps, but Ray did not. Their testimony tended to show that neither of them knew, at the time they took them, that the caps could be exploded otherwise than by means of a fuse. Eric testified that at that time he had never exploded a cap and had never seen one exploded; that he "guessed" he thought they could be exploded by a fuse, but did not know that they would "go off" any other way; that he fired some with a fuse which he got at home, his father having gotten it for use in blasting

with black powder for a well; that he did not fire any of the caps in any other way; that he did not know whether Ray or any one else fired any of the caps.

Ray Martin testified that he himself exploded one cap by placing it on a rock and throwing another rock at it. This was evidently the result of an experiment such as any boy would be likely to indulge. He did not say that Eric was present at the time, but used the word "we," thus inferring that he was. He did, however, testify directly that Eric fired his caps with a fuse, and did not intimate that he ever fired any in any other way.

Another boy testified that, a day or two before the accident, he heard explosions around the school house; that he was in the school house up stairs at a window and saw Eric Hilton at the side of the school grounds put something on a rock and hit it with another, causing an explosion; that he did not see any fuse or matches used.

Whether, prior to the time when the cap which caused the injury came into plaintiff's possession, Eric Hilton knew that such caps could be exploded by any other means than by a fuse, and appreciated their dangerous character, were questions of fact to be determined from the evidence. They cannot, on this evidence, be determined by the court as a matter of law. Considering all of the evidence bearing upon the subject, it is capable of the inference that he knew that dynamite caps were dangerous, but did not know, or at least did not appreciate, the extent of their dangerous character. The evidence is capable of the reasonable inference that he did not know that they could be exploded by concussion, or in an accidental manner without the aid of a fuse.

"In common with other courts, we have held that, in passing upon a motion for a nonsuit, the court must consider, not alone the literal statements of the witnesses, but every justifiable inference favorable to the party against whom the motion is directed." *Hillebrant v. Manz*, 71 Wash. 250, 128 Pac. 892.

See, also, *King v. Page Lumber Co.*, 66 Wash. 123, 119 Pac. 180; *Brown v. Walla Walla*, 76 Wash. 670, 136 Pac. 1166; *Young v. Aloha Lumber Co.*, 63 Wash. 600, 116 Pac. 4; *Johnson v. Johnson*, ante p. 18, 147 Pac. 649.

Whether either he or Ray Martin had an appreciating sense of the extent of the danger so as to be an intelligent intervening cause was, under the evidence, a question for the jury. This phase of the case is clearly controlled by the decision of this court in *Olson v. Gill Home Inv. Co.*, 58 Wash. 151, 108 Pac. 140, 27 L. R. A. (N. S.) 884, on a state of facts strikingly analogous to that here presented. In that case the boys who stole the dynamite and caps were about fourteen years of age. The boy who was injured was younger. The court said:

"In this case it was for the jury to determine whether respondent and the other boys, considering their age, their experience, and their knowledge of right and wrong, were in their acts governed by unreasoning and natural impulses. . . . The question as to whether the boys fully understood the criminal import of their act was properly submitted to the jury and determined adversely to the appellant's contention, as was also the question of the contributory negligence of the respondent, he being of tender age. There was evidence tending to show, that the boys, including respondent, did, to a limited extent, realize that dynamite was a violent explosive. They were trying to explode it; but the evidence further shows that they did not fully understand or appreciate all of its dangerous qualities. They supposed it could only be exploded by some method of ignition, and when they lit the fuse, they dodged behind large stumps for protection. It is evident, however, that they did not anticipate that any explosion could be produced in the manner in which it was produced. In the light of respondent's tender years, his limited knowledge, his lack of experience, and all of the facts and circumstances disclosed by the evidence, we cannot hold that he was, as a matter of law, guilty of such contributory negligence as to relieve the appellants from liability, but must hold that the question of his contributory negligence was an issue for the jury."

21—85 WASH.

In *Vills v. City of Cloquet*, 119 Minn. 277, 138 N. W. 33, another case closely parallel with this on the facts, the court said:

"The negligence of defendant in leaving the fuse caps where it did was not a remote cause; at least it was a question for the jury, and properly submitted to it. The cases have been so many times reviewed that we need do no more than state our conclusion, which we think is amply sustained by many decisions of this court. The principle is that where several concurring acts or conditions, one of them a wrongful act or omission, produce an injury, such wrongful act or omission is to be regarded as the proximate cause of the injury, if it be one which might reasonably have been anticipated from such act or omission, and which would not have occurred without it."

See, also, *Wellington v. Pelletier*, 173 Fed. 908; *United States Natural Gas Co. v. Hicks*, 134 Ky. 12, 119 S. W. 166, 135 Am. St. 407, 23 L. R. A. (N. S.) 249, and note thereto; *Akin v. Bradley Engineering & Machine Co.*, 48 Wash. 97, 92 Pac. 903, and note to same case 14 L. R. A. (N. S.) 586.

From these cases it is evident that courts do not and, we think, should not look too narrowly for independent intervening causes where the negligence is in the use or care of extremely dangerous agencies and the disastrous results of such negligence might reasonably be anticipated.

III.   It is equally clear that the act of appellant's mother was not an independent, intervening, efficient cause. In considering the motion for a nonsuit, we must assume that she told the truth. She testified, in substance, that when she took the playthings from the boy's pocket, she noticed the cap, and at first thought it was a ferule from a pencil, but concluded it was too small; that she noticed the cap because it was bright and new and something out of the ordinary; that she had never seen a dynamite cap prior to that time, and carelessly laid it on the desk with the other things, "not dreaming of its being a dynamite cap."

The respondent's primary negligence, which we have seen was a question for the jury, consisted in abandoning this cap in such manner that it was likely to fall into irresponsible hands, thus setting in motion a chain of causation from which might have been reasonably anticipated just such an injury as actually resulted. To say that this chain was broken, as a matter of law, by the unwitting failure of the mother to interrupt it, is to lose the logical perspective and take a distorted view of the relative importance of the incidents. It would be to eclipse the duty of one who knows of the dangerous character of an agency to control it, by magnifying the innocent failure of another to imagine a danger of which she had no knowledge, into a positive duty to know and avoid it. It would be to miss entirely the basic principle of the exercise of reasonable care, which measures the duty by the magnitude of the danger reasonably to be anticipated by one possessed of the knowledge necessary to foresee it. *Jobe v. Spokane Gas & Fuel Co.*, 73 Wash. 1, 131 Pac. 235, 48 L. R. A. (N. S.) 931; *Williams v. Spokane,* 73 Wash. 237, 131 Pac. 833; *Blair v. Spokane,* 66 Wash. 399, 119 Pac. 839; *Atherton v. Tacoma R. & Power Co.,* 30 Wash. 395, 71 Pac. 39.

The case of *Pittsburg Reduction Co. v. Horton,* 87 Ark. 576, 113 S. W. 647, 18 L. R. A. (N. S.) 905, relied upon by respondent, so far as it is sound is not in point, and so far as it is in point it seems to us unsound. It is based upon the court's argument from the evidence that the parents of the boy who found the explosive cap *knew of its dangerous character* and knew that he had it, yet permitted him to retain it for a week and finally to take it to school, where he gave it to another boy who was injured by it. This would be the sound view if the court were the trier of the facts. With deference to that court, however, we think the decision unsound in that it assumes the fact of the parent's knowledge in spite of the mother's testimony that she did not know what the cap was, and the father's testimony that he did not know

that the boy had it until he heard of it after the accident. Under our decisions, and what we conceive to be the sounder rule everywhere, their testimony made the question of their knowledge one for the jury. Under our decisions, if the court found this testimony so adverse to other conceded facts as to make it, in his opinion, unworthy of belief, he could, in his discretion, grant a new trial, but could not grant a judgment of dismissal *non obstante veredicto* without invading the province of the jury as triers of the facts. *Brown v. Walla Walla, supra.*

Every phase of this case is governed by our own decisions. The judgment of nonsuit cannot be sustained without resolving every inference from the evidence in favor of the respondent rather than in favor of the appellant, which is the converse of the correct rule.

Reversed and remanded for trial.

FULLERTON, MAIN, and CROW, JJ., concur.