[No. 26323. *En Banc.* March 10, 1937.]

JEANNIE LANG, *as Administratrix, Respondent,* v.
PUGET SOUND NAVIGATION COMPANY,
*Appellant.*[1]

[1]Reported in 65 P. (2d) 1069.

354

 

*Bogle, Bogle & Gates, Ray Dumett,* and *Stanley B. Long,* for appellant.

*Kerr, McCord & Carey,* for respondent.

BLAKE, J.—Midnight of August 16-17, 1934, Archibald Sangster boarded, at Seattle, the S. S. "Iroquois," belonging to the Puget Sound Navigation Company, bound for Victoria, via Port Angeles. At five o'clock in the morning, he was found lying on the floor of his stateroom, suffering from multiple posterior fractures of the second, third, fourth, fifth and sixth ribs on the right side. At Port Angeles, he was removed from the ship and taken to a hospital, where it later developed that he had suffered internal abdominal injuries. From the latter developed peritonitis, from which he died August 21st.

Plaintiff brought this action, charging that Sangster's injuries and death were due to negligence on the part of the defendant. In its answer, defendant denied negligence, and set up the defense of contributory negligence, alleging that Sangster became heavily intoxicated, and that such intoxication was the proximate cause of his injuries and death. On the issues so made, the cause was tried to a jury, which returned a verdict for plaintiff. From judgment entered on the verdict, defendant appeals.

The assignments of error raise three matters for consideration: (1) The sufficiency of the evidence to make a case for the jury on the question of negligence; (2) the refusal of the trial court to give certain instructions requested by appellant; (3) the giving of certain instructions.

*First:* As we read the record, we do not find any material conflict in the evidence, except in one particular, which we shall notice. The controversy, for the most part, centers about what reasonable inference, or inferences, may be drawn from admitted facts. There are some minor conflicts in the testimony, but we shall, in such instances, of course, state the facts in the light of the evidence most favorable to respondent.

Accompanying Sangster aboard the ship was one Robert Fee. They went directly to the purser's office, where Sangster purchased stateroom accommodations for both. They were assigned to stateroom 40, which was on the port side of the vessel. The stateroom was entered from an inside passageway. Opposite the door was a port hole. The room, following the side of the ship, was seven feet six inches long. Its width was six feet nine inches. On the aft end of the room, athwart ship, were two berths, one above the other. The outer edge of the lower berth was two feet nine and one-half inches from the wall; the outer edge of the upper, two feet six inches. Each berth had, along the outer side, a portable steel rail, designed to keep bedding in place, and also to keep the occupant of the berth from falling out in rough weather. There were two lugs at the end of each rail, which fitted into sockets attached to the walls of the room. When properly in place, it required a vertical lift of two and one-fourth inches to remove the rail from the sockets.

Against the wall opposite the berths, and toward the outward side of the ship, was a stationary wash bowl. Beneath this was a radiator, the valve wheel of which was set about eight inches out from the bowl toward the middle of the room. The distance between the wash bowl and a point midway of the outer edge

of the lower berth was four feet three inches. The furniture of the room consisted of two wicker chairs.

After securing their reservation, Sangster and Fee went directly to the stateroom. It was agreed that Fee should take the lower berth and Sangster the upper. The latter left the room and the former went to bed. Fee did not see Sangster again until five a. m. At that time, he was awakened by a groaning noise, and found Sangster lying on the floor, his head toward the wash bowl and his feet toward the door. One end of the steel rail of the upper berth was resting on the floor on the outward side of the room. Here we come to the one substantial conflict in the evidence. Members of the crew testified that it was the rail of the lower berth that was on the floor. Conceding that this would make some difference with respect to liability (which is doubtful), we are bound to accept respondent's version in considering the sufficiency of the evidence to make a case for the jury. Fee asked Sangster what happened. Sangster said: "I fell from—." He got no further.

We understand appellant to contend that these facts call for application of the rule that, where injury might be attributed to one of several causes, for one or more of which there would be no liability, the jury will not be permitted to speculate as to which of the causes brought about the injury. Application of the rule, however, does not place upon the person injured the burden of excluding every possible cause of the accident for which the defendant would not be liable. He is not required to prove negligence beyond a reasonable doubt. *St. Germain v. Potlatch Lumber Co.*, 76 Wash. 102, 135 Pac. 804; *McGinn v. North Coast Stevedoring Co.*, 149 Wash. 1, 270 Pac. 113. In the former case, the rule is stated:

"It is sufficient if his evidence affords room for men of reasonable minds to conclude that there is a greater probability that the accident causing the injury happened in such a way as to fix liability upon the person charged with such liability, than it is that it happened in a way for which the person so charged would not be liable. 'There are very few things in human affairs, and especially in litigation involving damages, that can be established to such absolute certainty as to exclude the possibility, or even some probability, that another cause or reason may have been the true cause or reason for the damage, rather than the one alleged by the plaintiff. But such possibility, or even probability, is not to be allowed to defeat the right of recovery, where the plaintiff has presented to the jury sufficient facts and circumstances surrounding the occurrence as to justify a reasonable juror in concluding that the thing charged was the prime and moving cause.' In other words, the plaintiff is only required to satisfy the jury, by a fair preponderance of the evidence, that the accident causing the death occurred in the manner he contends it did."

Now, in the light of the rule as above stated, we do not think the manner or cause of the accident is the subject of speculation at all. It seems to us that the only reasonable inference that can be drawn from the evidence is that, in attempting to get into the upper berth, Sangster took hold of the railing, which gave way, and he fell backward against the wash bowl. All the facts and circumstances substantiate these inferences—the railing on the floor; the position in which Sangster was lying; the location and character of his injuries.

Furthermore, the giving way of the railing raised a presumption of negligence. The burden then fell upon appellant to show that the giving way of the railing was not due to its negligence. *Lane v. Spokane Falls & N. R. Co.,* 21 Wash. 119, 57 Pac. 367, 75 Am. St. 821, 46 L. R. A. 153; *Wodnik v. Luna Park Amusement*

*Co.,* 69 Wash. 638, 125 Pac. 941, 42 L. R. A. (N. S.) 1070; *Hayes v. Staples,* 129 Wash. 436, 225 Pac. 417; *Highland v. Wilsonian Inv. Co.,* 171 Wash 34, 17 P. (2d) 631. The presumption of negligence is overcome only when the explanation shows without dispute that the happening was due to a cause not chargeable to a defendant's negligence. *Scarpelli v. Washington Water Power Co.,* 63 Wash. 18, 114 Pac. 870. No explanation being offered, the jury was warranted in inferring that the railing gave way because the lugs at the end had not been properly placed in the sockets on the wall.

██ *Second:* Appellant offered evidence to the effect that Sangster was intoxicated when he came aboard; that he was last seen about four o'clock, before going to his stateroom, and that he was then very drunk. The appellant requested two instructions of the same import, one of which reads as follows:

"If you find from a fair preponderance of the evidence that the decedent, Captain Archibald Sangster, was intoxicated or under the influence of intoxicating liquor, at the time of his alleged injuries, and that such condition on the decedent's part, and not the alleged negligence of the defendants or any of them, was the proximate cause of the decedent's alleged injuries and death, then and in that event your verdict must be for the defendants."

As we have seen, Sangster died of peritonitis, which was the direct consequence of his injuries. It is not intimated that alcoholism was in any sense the direct cause of death. Yet appellant seems to argue that, wholly independent of contributory negligence, intoxication may be considered the proximate cause of death of one who sustains fatal injuries when in that condition. The argument, as we understand it, is predicated on the theory that something (or anything) of a traumatic nature is more likely to happen to a drunken man than to a sober man, and that intoxica-

tion may be considered as the proximate cause of injury or death even in the absence of evidence connecting the intoxication with the traumatic event. This is not the law—at least not in this jurisdiction.

*Third:* The court instructed the jury that intoxication of the deceased, taken alone, would not absolve appellant of negligence; that to preclude recovery, there must have been some negligence on the part of Sangster materially contributing to his injury; that intoxication, however, was a circumstance to be taken into consideration in determining whether or not he was negligent. These instructions with respect to intoxication conformed to the rules laid down by this court in *Lawson v. Seattle & Renton R. Co.,* 34 Wash. 500, 76 Pac. 71, and in *Conrad v. Graham & Co.,* 54 Wash. 641, 103 Pac. 1122, 132 Am. St. 1137. In the former case, the court quoted with approval from *Denver Tramway Co. v. Reid,* 4 Colo. App. 53, 35 Pac. 269, as follows:

''Counsel says, 'This instruction commences by advising the jury that intoxication in itself, as a matter of law, is not such negligence as will bar his recovery in this action,' and ends by advising the jury that 'it must appear that the plaintiff did not exercise ordinary care, and that, too, without reference to his inebriety. The question is whether or not the plaintiff's conduct came up to the standard of ordinary care, not whether or not the plaintiff was drunk.' It requires considerable ingenuity to find fault with the language cited. It, in effect, properly states the law to be that the questions being tried were the negligence of the defendant and the contributory negligence of the plaintiff; not whether the plaintiff was at the time intoxicated. That drunkenness on the part of plaintiff would not relieve the defendant from liability, if guilty of negligence; and that, drunk or sober, if the plaintiff, by want of ordinary care, contributed to the injury, he must assume such responsibility, regardless of his condition. We cannot well see how it could

have been different. If drunk, he was held responsible for his negligence; and, if drunk, it can hardly be contended that it gave the defendant, for that reason, the right to kill or maim him, but, if known, imposed greater care on the defendant.''

The court gave an instruction stating the doctrine of *res ipsa loquitur,* to which appellant excepts. That the issue of negligence was properly submitted upon that theory, we think sufficiently appears from what we have said with respect to the sufficiency of the evidence to make a case for the jury.

Judgment affirmed.

MAIN, HOLCOMB, MILLARD, and GERAGHTY, JJ., concur.

STEINERT, C. J. (dissenting)—I disagree with the majority upon the first question discussed in the prevailing opinion, namely, the sufficiency of the evidence to make a case for the jury on the question of negligence of the appellant. Upon that issue, I am of the opinion that the verdict should not be allowed to stand.

Respondent's case is predicated upon two grounds of negligence: (1) That appellant failed to furnish a ladder for the use of Archibald Sangster in getting into the upper berth of his stateroom, or to notify him that such ladder was aboard the vessel and available for his use; and (2) that appellant negligently permitted the berth to be in an unsafe and unseaworthy condition and not fit for the use for which it was designed and provided, in that the guard rail on the upper berth was left in an insecure, unsafe and dangerous condition, so that it gave way when the passenger attempted to enter the berth.

It was, of course, incumbent upon respondent affirmatively to prove, by a fair preponderance of the evidence, that appellant was negligent in one or both of the particulars alleged, and that such negligence was the proximate cause of the injury.

Some facts, additional to those stated in the majority opinion, and the logical inferences to be drawn therefrom, should be given.

The deceased, Captain Archibald Sangster, was a retired master mariner who had for many years commanded large freight and passenger vessels sailing to all parts of the world. He had also been an officer in the British navy. He was, therefore, generally familiar with ships and their equipment.

The stateroom occupied by Captain Sangster on the steamer "Iroquois" was fitted with two berths. The distance from the floor of the stateroom to the lower margin of the rail of the lower berth, at its center, was one foot, three inches; the corresponding distance from the same point to the bottom member of the upper berth was four feet, one inch.

The steamer carried six ladders which were in charge of the steward and were available for use by the passengers. The staterooms were equipped with electric call bells, by means of which service to passengers could be supplied at their convenience.

At about one p. m. of August 16, 1934, Captain Sangster, a resident of Victoria, British Columbia, arrived in Seattle aboard a Canadian Pacific passenger boat. En route, he had met a man with whom he had a casual acquaintance. The two men spent the afternoon together in Seattle attending the races with a party of Captain Sangster's relatives and friends. The two visitors from Victoria each had four glasses of beer, "race track size," during the afternoon. Leaving the races, the party stopped at a liquor store and then proceeded to the Dog House restaurant, where they arrived at about 7:15 p. m. They began their dinner about 9:45 p. m. and finished it about 11:15 p. m. They then repaired to the home of Captain Sangster's relative, where gin and whiskey were

served, but, according to the testimony, which was incapable of rebuttal, the captain drank nothing at that time. However, one of the party presented him with a bottle of whiskey, which he took with him to the boat.

Sangster and his acquaintance boarded the "Iroquois" about midnight. After being assigned to their stateroom, Sangster's companion at once retired and, according to his story, did not awaken until about five a. m. Sangster did not retire. At about two a. m., the night saloon man found him near the purser's office and accompanied him back to his stateroom. At about 3:30 a. m., the saloon man saw him sitting in a chair in the hallway, in a dazed condition, and again escorted him to his stateroom. At four a. m., the same employee saw him in the corridor and again took him back to his stateroom, this time suggesting to him that he had better get some sleep. At a little after five o'clock, this same employee heard groans from the captain's stateroom and immediately entered. Other employees of the boat were summoned.

When Captain Sangster was found, he was lying on the floor of the stateroom and was fully dressed; his berth had not been disturbed. On the floor near him was a whiskey bottle. Some one had vomited over the floor and in the wash basin, and the fumes of liquor were strong. A physician, called as a witness by respondent, testified that he saw Captain Sangster in his stateroom at about 6:30 a. m., after the accident, and that he then smelled of liquor and gave evidence of being intoxicated.

The only evidence with reference to the condition of the guard rail prior to the time of the accident was given by appellant's witnesses. Their testimony was to the effect that the stateroom was periodically and thoroughly inspected, that it had been inspected a day

or two before the accident and that the guard rail was then securely in place; moreover, that, on the night of the accident, the rail was in place up to the time when Sangster was last seen before sustaining his injury. There is no contention that the rail was broken or bent, but merely that it was out of place.

From the facts above narrated, I do not see how anyone can escape the conclusion that Captain Sangster was intoxicated. At any rate, it can not be said that it is more probable that he was not. While this, of course, would not constitute a defense to negligence, if such there was, it at least dissipates the conclusion that Captain Sangster was acting as a normal man while in his stateroom.

At this point, we are left wholly to conjecture as to how the accident occurred. Did Captain Sangster sustain his injuries because of a fall while in a drunken stupor? Did he himself, in attempting to get into the berth, lift the rail from its fastenings, as he easily could have done? Had he already mounted into his berth and then suddenly taken a notion to get out again for the purpose of leaving his stateroom, as he had done several times before? Did he roll out of his berth after he had gotten into it? Or had he and his companion had some altercation regarding the occupancy of one or the other of the two berths, as a result of which he fell or was knocked over? The evidence was that, when he was found, he was conscious and was kicking at the lower berth occupied by his companion.

"The whims which seize and control intoxicated men and the accidents that are liable to occur to them are so manifold that it would be the merest guesswork to undertake to account for the location of the body of the deceased at the point where it was found as shown by the record in this case." *Armstrong v. Cosmopolis*, 32 Wash. 110, 72 Pac. 1038.

With reference to the matter of supplying a ladder, the evidence shows that it was available and subject to the captain's demand. It was not the duty of the appellant to keep a ladder in the stateroom, whether the occupants wanted it or not. It was the captain's duty to ask for it, if he felt that he needed it. The appellant's employees had shown him every consideration, and it was not their duty to put him to bed against his will. The condition of the room at 6:30 a. m. indicates very clearly what the captain had been doing earlier in the morning. Unfortunate as the result was, it was, obviously, the consequence of his own condition brought on by himself, and not attributable to any proven negligence of appellant.

It is a primary rule of circumstantial evidence that the circumstances should not only concur to show that the thing charged happened in a particular way, but that they are inconsistent with any other rational conclusion. If there is nothing more tangible to proceed upon than two or more conjectural theories, one or more of which is sufficient to support a charge of negligence and the others are not, then it is for the plaintiff to exclude, by the greater weight of the evidence, the operation of those causes that do not give ground for liability. *Parmelee v. Chicago, M. & St. P. R. Co.*, 92 Wash. 185, 158 Pac. 977.

In the attempt to escape this rule, the majority assert two principles as controlling the case. The first assertion is that a plaintiff, in order to relieve the case of its speculative features, is not required to prove negligence beyond a reasonable doubt. In support of that assertion two cases are cited and relied on: *St. Germain v. Potlatch Lumber Co.*, 76 Wash. 102, 135 Pac. 804, and *McGinn v. North Coast Stevedoring Co.*, 149 Wash. 1, 270 Pac. 113. In each of those cases, there was direct evidence of a defect in the particular

appliance, from which negligence and the consequent injury could be reasonably inferred. In the case at bar, however, there is no proof of any defect or of any negligence, but merely an inference thereof. From a combination of circumstances which support many divergent theories, an inference of negligence is drawn, to the exclusion of other inferences, equally sound and upon which no liability could be predicated. All of the circumstances in this case taken together can be converted into a definite result only by the introduction of surmise and conjecture.

The other assertion in the majority opinion is that the facts shown raise a presumption of negligence, thereby casting upon the appellant the burden of showing that the giving way of the rail was not due to its negligence. The following cases are cited in support of the pronouncement: *Lane v. Spokane Falls & N. R. Co.,* 21 Wash. 119, 57 Pac. 367, 75 Am. St. 821, 46 L. R. A. 153; *Wodnik v. Luna Park Amusement Co.,* 69 Wash. 638, 125 Pac. 941, 42 L. R. A. (N. S.) 1070; *Hayes v. Staples,* 129 Wash. 436, 225 Pac. 417; *Highland v. Wilsonian Inv. Co.,* 171 Wash. 34, 17 P. (2d) 631; *Scarpelli v. Washington Water Power Co.,* 63 Wash. 18, 114 Pac. 870.

In the *Lane* case, there was a collision between a railroad engine and a passenger car, in the aisle of which the plaintiff was standing. As a result of the collision, the passenger was injured. In such case, it was, of course, the duty of the railroad company to absolve itself of the negligence shown by the occurrence, since no question of the negligence of the passenger could possibly arise under the circumstances.

In the *Wodnik* case, it was shown that the head of a mallet used in connection with a striking machine in an amusement park flew off while actually being used by a patron of the park. In other words, it was

shown that the person injured was using the device in the way that it was intended to be. There was, and could be, no inference whatever that the patron had improperly used the device. The court said:

"It is plain that had the head of the mallet been securely fastened to the handle, the accident would not have happened, no matter where the respondent grasped the handle. It is equally plain that he was not guilty of contributory negligence. He had no reason to assume that the head of the mallet would fly off. In fact, as we have seen, he had the right to assume that it would not. There was no evidence that he was not using the mallet as it was intended to be used."

In the *Hayes* case, the operator of an automobile stage, while rounding a curve, drove on the left side of the highway and in abruptly turning to his right side ran off the road into a ditch, injuring a passenger. The court said:

"The rule is general that a plaintiff makes out a *prima facie* case of negligence against a common carrier when he shows that he was injured while riding for hire and in the usual manner on a conveyance furnished by the carrier, and that the injury was caused by some defect in or management of the conveyance over which the carrier had exclusive control."

In that case, there was positive evidence to the effect that the accident happened through mismanagement of the driver; hence the verdict was in no sense speculative or conjectural.

In the *Highland* case, the injury to the plaintiff was proximately caused by the blowing out of a plug or nipple of the crank-case of an ice machine. There was evidence to the effect that the nipple was old, rusty and cross-threaded. The cause of the accident having been shown, and the device being under the exclusive control of the defendant, and the accident being such as in the ordinary course of events does not happen,

it called for explanation by the defendant that the accident did not result from want of care on its part. In the case at bar, it was not shown how the accident occurred. On the contrary, from the mere fact of injury, the jury was allowed to speculate as to how it happened.

The *Scarpelli* case has no bearing whatever upon the case before us, and the rule of law deduced therefrom has no application to the facts involved here. In the first place, the result of the *Scarpelli* case was just the contrary to what is contended for here. In the next place, the plaintiff there had made a *prima facie* case of negligence by evidence tending to show how the accident had actually happened, which the defendant was rightly called upon to explain. In the case before us, there is no evidence as to what caused the injury. It is simply assumed that, because Captain Sangster was injured, his injuries must have occurred by reason of negligence attributable to the appellant.

The difficulty with the prevailing opinion is that it begs the question in this case. Its reasoning is that, since Captain Sangster sustained an injury on the boat in a manner that might be accounted for in one of many ways, therefore it became the duty of the appellant to show that it did not occur through its negligence.

The correct rule is as announced in the cases above cited, that, when a thing which causes the injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care. But in this case, it was not shown what caused the injury, nor can it be said that the accident was such as in the ordinary

course of things does not happen if those who have the management use proper care. There was no evidence that there was any defect in the rail itself, or that it had' given way by reason of any negligence on the part of the appellant. How it came to be out of place four hours after Sangster and his companion entered the stateroom, is a matter that no one can tell from the evidence adduced. The inferences at best are balanced, and, in my opinion, point to the act or conduct of some one occupying the stateroom.

I therefore dissent.

TOLMAN, BEALS, and ROBINSON, JJ., concur with STEINERT, C. J.