[No. 27928.   Department Two.   August 30, 1940.]

HAROLD F. NELSON, *Respondent*, v. WEST COAST DAIRY
COMPANY *et al., Appellants*, CHARLES KEMPMA
*et al., Defendants.*[1]

[1]Reported in 105 P. (2d) 76.

*Newton & Newton,* for appellants.

*Little & Leader* and *Charles A. Turner,* for respondent.

STEINERT, J.—Plaintiff brought suit against West Coast Dairy Co., a corporation, Peter Rodstrom and Selma Rodstrom, husband and wife, the copartnership composed of Charles Kempma and Albert Miller, doing business as Kempma & Miller, and against Charles Kempma and Gwaantje Kempma, husband and wife, and Albert Miller, individually, to recover damages alleged to have been sustained by plaintiff as the result of undulant fever contracted from drinking milk produced and marketed by defendants. The action was tried to the court sitting without a jury, and resulted in findings in plaintiff's favor as against defendants West Coast Dairy Co. and Peter Rodstrom and wife. As against the defendant copartnership and its constituent members, the action was dismissed. Judgment was entered accordingly, and defendants West Coast Dairy Co. and Rodstrom and wife appealed.

Kempma & Miller operated a dairy farm in Snohomish County. The milk produced by its herd was sold to West Coast Dairy Co., operating a dairy in the city of Everett. The dairy company, in turn, daily sold a part of the milk to Peter Rodstrom, who conducted a milk route in Everett.

Respondent had purchased pasteurized milk from

Rodstrom for a number of years prior to the spring of 1937. In April of that year, a sanipractor prescribed *raw* milk for respondent's eleven-year-old daughter, who was suffering from malnutrition, and Rodstrom was accordingly asked to leave one bottle of raw milk and one of pasteurized milk at respondent's home each day. Through some mistake or oversight, Rodstrom did not always fill the order exactly as given. During the first two weeks, he at times left one bottle of each kind of milk, as requested, but at other times he left two bottles of raw milk and none of pasteurized milk. From the latter part of April, and until the deliveries were discontinued in August, he left, each day, two bottles of raw milk only. Of this raw milk, respondent drank an average of three or four glasses a day.

Prior to June, 1937, respondent had never been afflicted with any serious illness, but on the contrary had always enjoyed good health. In the latter part of that month, however, he became seriously ill. He was forced to stop work for an initial period of approximately one week, then returned to his employment for about three days, and thereafter was unable to work for a period of approximately six months, from June 29, 1937, to December 23, 1937. Since the latter date his physical condition has permitted him to work part-time only.

Respondent continued to drink raw milk delivered by Rodstrom until August, 1937, when his illness was diagnosed as undulant fever. Blood tests made at that time disclosed a high degree of infection with that disease. A blood test made August 29, 1939, shortly before the trial of this action, disclosed a degree of infection sufficiently low to class the ultimate result as doubtful. Appellants concede that respondent was suffering from undulant fever at the time of his original

ailment, but deny that the illness was contracted through the consumption of milk provided by them.

Ordinance No. 2440 of the city of Everett, relating to, and regulating, the production, sale, and distribution of milk and milk products, provides, among other things, that it shall be unlawful for any person to sell for human consumption in that city any milk drawn from cows suffering from any disease, or milk containing pathogenic bacteria, or disease-producing germs, or milk which is unwholesome or impure. Respondent's cause of action is predicated not only on allegations charging appellants with violation of this specific ordinance, but also on the common law doctrine governing liability for negligence or breach of warranty in the sale of food that is unfit for immediate human consumption.

Respondent had alleged in his complaint that the milk consumed by him was produced by the herd of Kempma & Miller, and that the milk was unfit for human consumption because it had been drawn from cows infected with Bang's disease. The proof, however, disclosed that the milk which was delivered to respondent had been, in almost equal part, obtained by appellants from a herd owned by one Carl Hansen; that Hansen's herd had at times been infected with the same disease; that the raw milk from both sources, though bottled and packed in cases at the respective farms, was intermingled, by cases, when it reached the West Coast Dairy Co.; and that deliveries to Rodstrom, and in turn by him to respondent, were made indiscriminately from milk provided by both farms.

At the conclusion of the evidence, the trial court, in an oral decision, expressed the view that the most reasonable conclusion to be drawn from the evidence was that respondent had contracted his ailment from

the milk consumed by him. However, the court expressed the further view that

" . . . there is at least as much ground to believe that he [respondent] contracted that fever from milk that came from the Hansen ranch as to say it came from milk that came from Kempma & Miller."

For that reason, the court concluded that respondent had not sustained the burden of proof as to defendants Kempma & Miller, and accordingly held that those defendants should be dismissed for want of proof. As to the remaining defendants in the case, West Coast Dairy Co. and Rodstrom and wife, appellants herein, the trial court was of the opinion that respondent had sustained the burden of proving that his illness was the proximate result of the consumption of raw milk sold by them. Upon that basis, findings were made and judgment was entered against the parties now appealing.

Appellants' first contention is that the dismissal of Kempma & Miller required the dismissal of the remaining defendants, that is, the appellants herein. This contention is based upon the fact that throughout his complaint, even in those paragraphs directed immediately against the defendants other than Kempma & Miller, respondent had specifically alleged that the milk from which he had contracted undulant fever came from the Kempma & Miller herd.

Were the dismissal of Kempma & Miller based on insufficiency of the evidence to show impurity of any and all milk sold by appellants, regardless of its source, the result contended for by appellants would clearly follow. That, however, was not the basis of the trial court's holding. We quote from the court's oral decision:

"The herd of Kempma & Miller, I take it is established, was afflicted or infected with Bang's disease,

at such time and over such period of time and it is well-established by fairly preponderating proof that the milk which they sold to the West Coast Dairy Company and which was sold to Rodstrom and which he sold to plaintiff [respondent], carried the germ of this disease. . . . "

It thus appears that the trial court was of the view that the Kempma & Miller herd *was* infected with the disease, and that the milk from that herd carried the germ of that same disease. But, since the court could not say positively that respondent contracted the fever from the Kempma & Miller milk rather than from that produced by another herd similarly afflicted, it felt compelled to dismiss those particular defendants. Whether or not the court ruled correctly in that respect, we are not called upon to decide, for respondent has not appealed from that order.

That conclusion of the trial court, however, is in no manner inconsistent with its further conclusion that West Coast Dairy Co. and Rodstrom sold infected milk to respondent, and that, as a proximate result of the consumption of such milk, Nelson contracted undulant fever. In the opinion of the trial court, the impurity of the milk produced by Kempma & Miller was established by a preponderance of the evidence. *But because* the proof further showed that milk obtained by appellants from another source was likewise infected, the trial court was of the opinion that the burden of proving that respondent had contracted his illness through the consumption of milk produced by Kempma & Miller had not been sustained. That additional proof, however, in no way negatived the liability of appellants, who sold and distributed the milk.

Where articles of food are sold for domestic use and immediate consumption, the law implies a warranty that such articles are sound, wholesome, and

fit to be consumed, and if the consumer is made sick through the consumption of such food, he has a right of action against the vendors thereof, either for breach of implied warranty or for negligence; and in such action it is unnecessary either to allege or to prove scienter. *Mazetti v. Armour & Co.*, 75 Wash. 622, 135 Pac. 633, Ann. Cas. 1915C, 140; 48 L. R. A. (N. S.) 213; *Flessher v. Carstens Packing Co.*, 93 Wash. 48, 160 Pac. 14; *Davis v. Van Camp Packing Co.*, 189 Iowa 775, 176 N. W. 382, 17 A. L. R. 649.

This subject has been frequently dealt with by the various courts of this country, with the result, as stated in the annotation (supplementing *New Orleans v. Vinci*, 153 La. 528, 96 So. 110, 28 A. L. R. 1382) appearing in 28 A. L. R., at page 1385, that

"By the great weight of authority, the seller is under the duty of ascertaining at his peril whether an article of food conforms to the standard fixed by statute or ordinance; and the validity of regulations which, in express terms or by construction, dispense with scienter as a condition of the offense, is almost uniformly held or assumed."

On page 1392 of the same annotated report appears the following summary of the decisions respecting the sale of milk as it comes from the herd:

"One who sells milk which fails to conform to the standard prescribed by law is liable, even though the milk has not been tampered with by the seller and is sold in the same condition as when it came from the herd."

From the necessities of such situations, and in reason, the consumer's right of recovery is not limited to an action against his own immediate vendor, but reaches the retailer, wholesaler, producer, and all others who participate in the sale and distribution of such deleterious articles of food.

For the reasons given, we conclude that the dismissal of defendants Kempma & Miller did not, of itself, require the dismissal of the appellants herein.

Appellants' second contention presents the major question in the case, namely, whether or not the court's findings as to the cause of respondent's illness were based on speculation and conjecture. The determination of that question requires a consideration of the evidence. The record is voluminous, and we cannot hope to do more than to give a general statement of the evidence adduced by the respective parties.

Respondent's case, other than as already recited, may be summarized as follows: In June, 1937, respondent was about forty years of age. Since 1933, he and his wife and two minor children have lived in the city of Everett. For twenty-five years he has been employed by Bayside Iron Works in that city, and is now a supervisor in charge of its various departments. Much of his work has been done under tension and pressure, involving long hours and many evenings spent in going over blueprints.

Undulant fever is a disease which, as indicated by its name, manifests itself in recurring waves. Over a long period of time, it may successively intensify and subside. The medical profession has given it particular study since about 1930, but as yet has discovered no cure for it. It has been definitely established, however, that the germ of the disease is the same as that found in "brucella abortus," commonly known as "Bang's disease," to which practically all animals, more particularly cattle, goats, and swine, are subject. Cows that are infected with the disease are likely to eliminate the organism in their milk, because the germ localizes itself in the udder, and it has been found that fifty per cent of all cows so infected actually do eliminate the organism in that manner. It has also been found

that cows which, when tested, show a blood titer of 1-200 almost invariably shed the germs in their excretions, including the milk, and that some cows having a blood titer as low as 1-50 will do likewise. The higher the titer, the greater and more virulent the organism, and even milk with an extremely low bacterial count may be heavily contaminated.

Bang's disease is one of the most contagious diseases to which cattle are subject. One cow can easily infect an entire herd. The incubation period in the animal varies from thirty days to four months.

According to well recognized medical authority upon the subject, undulant fever is contracted by human beings as the result of drinking raw milk, or by contact with infected animals. If all milk were efficiently pasteurized or boiled before being consumed, there would be no brucellosis except in those occupational groups whose work brings the individual in contact with infected animals or infected carcasses. Among city dwellers and others who do not come in contact with animals, the chief source of undulant fever is raw milk. The incubation period of the organism in human beings is said to range from two weeks to a month.

A peculiarity of undulant fever is that it occurs four times as frequently in men as it does in women, and rarely ever does it occur in children. This may be accounted for, in part, by the fact that many men engage in occupational pursuits which bring them in contact with infected animals and infected carcasses. It is generally agreed that whether or not one will succumb to the disease will depend largely upon the condition of one's health, his power of resistance, and his general susceptibility.

On January 31, 1936, a state test was made of the Kempma & Miller herd, consisting of forty-nine cows at that time. The test was voluntary on the part of the

owners of the herd. It showed, however, that eleven cows were infected with Bang's disease, and that three others were "suspects." A subsequent test of the three suspects showed one to be a "reactor," while the other two were clear. All reactors were slaughtered as soon as their condition was discovered. In March, 1936, the whole herd, consisting of fifty-six head at that time, was again tested, showing no reactors, but three suspects. The suspects were separated from the rest of the herd, and later, upon another test, one was found to be a reactor, while the other two showed "negative." In November, 1936, a suspected animal alone was tested, and was found to be infected. No test of the entire herd was again made until November, 1937, several months after respondent became ill, at which time, out of a herd of fifty-seven cattle, there were twenty reactors and four suspects.

A similar test of the Hansen herd was made in February, 1936. It disclosed two reactors, and they were promptly slaughtered. In April, 1936, a test of twenty-five head disclosed no reactors and but one suspect. No further information concerning the suspect is furnished by the record. No further tests of the Hansen herd were made until September, 1938, at which time, out of twenty-five head of cattle, there were three reactors and one suspect.

Appellants' evidence, in so far as it varies from, or is additional to, respondent's evidence, may be summarized as follows: Bang's disease affects not only cattle, goats, and hogs, but also horses, sheep, dogs, cats, rats, and possibly chickens. The most virulent type of the disease is found in hogs, the next in goats, and the next in cattle.

In 1937, there were 306,000 milk cows and 642,000 head of cattle in the state of Washington. In that year, at least fifty per cent of the milk used came from

untested cows. Tests were not at that time required, and, when taken, were wholly voluntary on the part of the cattle owners. In Snohomish county, during that same year, there were 25,000 milk-producing cows, of which about fifty per cent were tested for Bang's disease. In Everett, thirty-five per cent of the milk consumed was unpasteurized. In a herd of cows affected with Bang's disease, only a certain number of the animals will throw off the germ; cows having a blood titer of less than 1-200 do not eliminate the germ in the milk in more than fifty per cent of the cases. Of the cows tested for the first time in the year 1934, fourteen per cent gave a positive reaction to Bang's disease; since then the percentage has decreased.

The disease may be transmitted to human beings by contact through any of the services of the body, through abrasions in the skin, through the eyes or membranes, through the respiratory tract, or by the ingestion of germs through the osculatory tract, and even through the open pores of the skin. Meat, cheese, butter, and other dairy products may carry the germ. The principal conductors of the germ, however, are dust and things that are ingested, and it is often difficult to determine just how one has acquired the disease. There is still a great deal about the subject which is unknown to the medical profession. When, however, the disease becomes established in a human being, it is known as undulant fever.

The authorities agree that undulant fever is primarily an occupational disease. The disease is most prevalent among farm workers, who present forty per cent of the cases, and in slaughter-house workers, who furnish ten to fifteen per cent of the cases. Laboratory workers and veterinarians also have a high rate of infectivity. Anyone, in fact, who is customarily around animals may become infected.

When a disease has been diagnosed as undulant fever, it is required to be reported to the state authorities. In 1937, there were only twenty-six cases of undulant fever reported in the state of Washington; of these, only one case, that of respondent, was from Everett, and only one other case was from Snohomish county.

Prior to the time that respondent's ailment was diagnosed, he had occasionally bought a bottle of raw milk from sources other than the appellants. He customarily used meat and butter in his own home, and at times dined with friends or at restaurants, where he partook of butter and cream. At the place where he worked, trucks were repaired, but where the trucks came from or how they had been used was not known. Near the place where respondent worked were located the Great Northern Railway tracks, which respondent crossed daily. The evidence touching the facts stated in this paragraph was adduced, of course, by appellants to support an inference that respondent could have contracted the disease through sources other than the milk supplied by appellants.

Although tests of milk are frequently made to determine the presence or absence of undulant fever germs, no test was ever made of any milk purchased by respondent from appellants, nor was any culture of respondent's blood taken in order to determine the variety of Bang's disease with which he had been affected, that is whether it was of the porcine, caprine, or bovine type. Medical authorities are now encouraged to think that milk cannot cause undulant fever except when it contains germs of an unusual degree of virulence.

As a conclusion to our statement of the evidence, we may say that it appears affirmatively that during the time involved in this action, respondent neither owned,

nor came in contact with, any animal of the kind mentioned above as being susceptible to Bang's disease. Nor had he ever been about any farm, or other place, where such disease is likely to be found. In the late summer of 1937, he purchased a dog, but that was after he had contracted the fever.

It is appellants' contention that this evidence, as outlined, was insufficient to warrant a finding that respondent's fever was caused by the consumption of infected raw milk sold and delivered to him by appellants, and that consequently such finding was based purely on speculation and conjecture.

■ It is true that a finding or verdict cannot be made to rest upon mere speculation or conjecture, and that the evidence must present something more than a mere possibility that an accident or injury may have occurred in a particular way.

However, it is likewise true that negligence, like any other fact, may be proved by circumstantial evidence, and that such evidence is sufficient to sustain a finding or verdict if it shows that in all reasonable probability the plaintiff's injuries were the proximate result of the defendant's negligence. *St. Germain v. Potlatch Lumber Co.*, 76 Wash. 102, 135 Pac. 804; *Mathis v. Granger Brick & Tile Co.*, 85 Wash. 634, 149 Pac. 3; *Sommer v. Yakima Motor Coach Co.*, 174 Wash. 638, 26 P. (2d) 92; *Kantonen v. Braley Motor Co.*, 176 Wash. 577, 30 P. (2d) 245; *Lang v. Puget Sound Nav. Co.*, 189 Wash. 353, 65 P. (2d) 1069.

In the *St. Germain* case, *supra*, the question before this court was whether the evidence was sufficient to warrant a finding that the death of a brakeman was caused by the negligent act of the defendant lumber company, or whether, on the contrary, the evidence merely left the cause of the accident speculative and

conjectural. Holding that the evidence was sufficient to warrant such finding, this court said in that case:

"A plaintiff in this character of case is not obligated to establish the material facts essential to a recovery beyond a reasonable doubt. Such a rule would amount to a denial of justice. It is sufficient if his evidence affords room for men of reasonable minds to conclude that there is a greater probability that the accident causing the injury happened in such a way as to fix liability upon the person charged with such liability, than it is that it happened in a way for which the person so charged would not be liable. 'There are very few things in human affairs, and especially in litigation involving damages, that can be established to such absolute certainty as to exclude the possibility, or even some probability, that another cause or reason may have been the true cause or reason for the damage, rather than the one alleged by the plaintiff. But such possibility, or even probability, is not to be allowed to defeat the right of recovery, where the plaintiff has presented to the jury sufficient facts and circumstances surrounding the occurrence as to justify a reasonable juror in concluding that the thing charged was the prime and moving cause.' In other words, the plaintiff is only required to satisfy the jury, by a fair preponderance of the evidence, that the accident causing the death occurred in the manner he contends it did."

In the *Mathis* case, *supra,* this court, in reversing a judgment of nonsuit, observed:

"Many familiar decisions are cited to the effect that verdicts based upon pure conjecture will not be permitted to stand. In applying this principle the respondent loses sight of the clear distinction between pure conjecture and reasonable inference. Negligence, like any other fact, may be proven by circumstantial evidence."

Similar expressions are contained in the other cases above cited.

Appellants cite and rely on two cases: *Parmelee v.*

Chicago, M. & St. P. R. Co., 92 Wash. 185, 158 Pac. 977, and Webber v. Pacific Power & Light Co., 137 Wash. 560, 242 Pac. 1104.

In the Parmelee case, supra, this court held, that under the facts and circumstances there shown, the alleged cause of death had not been proved, either by direct evidence or by circumstantial evidence. However, the opinion in that case fully recognized the principle which we here apply. We quote two statements therefrom:

"If there be proof of probable cause, whether the injury resulted in consequence of the established cause may be left to reasonable inference. That is what is meant by reasonable inference from established facts." (p. 188)

"It is not a possible theory, but inference from facts reasonably ascertained, which impels. It is that conclusion to which the mind will inevitably return when it weighs the circumstances for either side, and will say, not arbitrarily, but as a result of due deliberation and a measuring of all the facts, that the proximate cause of the accident is to be found in the negligent conduct of the party charged." (p. 192)

In the Webber case, supra, suit was brought to recover damages for the contraction of typhoid fever alleged to have been caused by impure water furnished by the defendant. Judgment for plaintiff was reversed on the ground that the verdict rested upon pure conjecture and speculation. It appeared, however, in that case, that plaintiff's attending physician was of the opinion that three other cases of typhoid fever in the same community during the same general period had resulted from causes other than water furnished by defendant; that plaintiff's original analysis of the water showing typhoid germs was of no evidentiary value in the particular case because of the peculiar circumstances under which the analysis

was made; and that a subsequent, properly conducted analysis failed to disclose the presence of typhoid bacteria. That case has little bearing upon the situation here.

Considering the evidence from every angle, we are of the opinion that the trial court was fully warranted in finding that the most probable cause of respondent's illness was his consumption of infected raw milk furnished by appellants, and that, in arriving at that conclusion, the court was not moved by, nor required to indulge in, conjecture or speculation. It is conceded that respondent had undulant fever; it was shown that among urban dwellers the principal cause of such fever is the ingestion of raw milk that is infected with the germs of Bang's disease; it was reasonably established that the cows from which respondent obtained the milk, through appellants, were afflicted with Bang's disease during the period of such consumption. On the other hand, the possible causes of respondent's illness, as suggested by appellants, have so little support in the evidence and the inferences to be drawn therefrom that they themselves may indeed be said to amount to little more than conjecture and speculation. It seems to us that respondent has, by circumstantial evidence, made as clear a case of liability as could be expected or required in a case such as this. While it cannot be positively asserted that in this case it has been demonstrated beyond all doubt that infected milk was the proximate cause of respondent's illness, it is, we think, as stated in the *Parmelee* case, *supra,* "that conclusion to which the mind will inevitably return when it weighs the circumstances for either side."

Appellants' final assignment of error is that the court erred in refusing to grant their motion for new trial on the ground of newly discovered evidence.

Numerous affidavits in support of the motion were filed by appellants, and a number of counter-affidavits were filed by respondent. It is unnecessary to recite their contents in detail.

In ruling on the motion, the trial court reviewed the matter set forth in the various affidavits and came to the conclusion that if the facts therein alleged had been presented at the trial, the result would not have been different. For that reason, the motion was denied.

To justify the granting of a new trial on the ground of newly discovered evidence, the new evidence must be such as might reasonably be expected to change the result. *Hoxsey v. Murray,* 84 Wash. 588, 147 Pac. 205; *Roe v. Snyder,* 100 Wash. 311, 170 Pac. 1027; *Grist v. Schoenburg,* 115 Wash. 335, 197 Pac. 35; *Trainor v. Interstate Const. Co.,* 187 Wash. 142, 60 P. (2d) 7.

The cases just cited are also authority for the proposition that a motion for a new trial on the ground of newly discovered evidence is addressed to the sound discretion of the trial court, and its exercise of that discretion will not be disturbed except for manifest abuse.

We agree with the trial court's conclusion as to the weight and effect of the various affidavits; and, in any event, we are unable to perceive any abuse of discretion in its ruling on the motion.

The judgment is affirmed.

BLAKE, C. J., BEALS, JEFFERS, and DRIVER, JJ., concur.